REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2686

September Term, 2013

_____

CLARENCE CEPHEUS TAYLOR, III

v.

STATE OF MARYLAND

_____

Krauser, C.J.,
Wright,
Arthur,

JJ.

_____

Opinion by Arthur, J.

_____

Filed:  January 27, 2016

This appeal concerns whether a deaf criminal defendant has the constitutional right to confront the interpreter who interpreted his statements during a police interrogation, when the State offers those interpretations as evidence against him in a criminal prosecution.

Clarence Cepheus Taylor III, who is deaf, was arrested on the allegation that he had sexually abused minors. With the aid of sign-language interpreters, detectives interrogated him for almost five hours. Over Taylor's objection at trial, the court admitted a recording that included audio of an interpreter's English-language interpretations of Taylor's sign-language statements. A jury found Taylor guilty of abusing two of the seven complaining witnesses.

Foremost among the issues raised in this appeal, Taylor contends that under *Crawford v. Washington*, 541 U.S. 36 (2004), the admission of the interpreter's statements violated his constitutional right to be confronted with the witnesses against him. His contention is correct, and the judgments must be reversed.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Taylor's Supervisory Role at the Maryland School for the Deaf

Taylor was born without the ability to hear. He communicates primarily through American Sign Language (ASL). He can read and write in English, but he does not speak English or understand spoken English.

In 2001, Taylor began working as a Student Life Counselor at the Columbia campus of the Maryland School for the Deaf. The Columbia campus, which serves students from pre-kindergarten through eighth grade, provides a residential dormitory to

accommodate students who live far away from the facility. Taylor typically supervised groups of five or six male students in the afternoons and evenings. He later took on additional responsibilities as an after-school coordinator and basketball coach for both boys and girls.

Taylor's employment came to an end in the fall of 2012. In November of that year, the School received a report from four female students, De., M., P., and S., who claimed that Taylor had touched them inappropriately at the Columbia campus between 2008 and 2011. The School placed Taylor on forced leave and reported the accusations to the Howard County police.

## B. Criminal Investigation by Howard County Police

Detective Penelope Camp served as lead investigator. Based on the results of her interviews of three students, she arrested Taylor and brought him to the police station for questioning on December 6, 2012. The nearly five-hour interrogation was recorded by video cameras and microphones.

Because Detective Camp is unable to use or understand sign language, she arranged for a team of two interpreters to facilitate the questioning: Mr. Joe L. Smith, an ASL interpreter who could hear the detective's questions; and Ms. Charm Smith, a Certified Deaf Interpreter (CDI) who could not hear the questions. The detective asked questions in English, which the interpreters conveyed to Taylor through sign language; Taylor responded in sign language; the two interpreters converted his responses into English; and then Mr. Smith provided his spoken English interpretations of what Taylor had said in sign language. This collaborative interpretation process is known as relay

interpretation or intermediary interpretation.  *State v. Wright*, 768 N.W.2d 512, 518 n.2 (S.D. 2009) (citing *Linton v. State*, 275 S.W.3d 493, 510 (Tex. Crim. App. 2009) (Johnson, J., concurring)); *see also Vasquez v. Kirkland*, 572 F.3d 1029, 1032-33 (9th Cir. 2009).[1]

Through the interpreters, Detective Camp informed Taylor that he had "the right to remain silent," that "anything [he] sa[id] may be used against [him]," and that he had the right to have an attorney present.  Taylor briefly inquired about the meaning of "the right of getting a counsel."  Taylor then read and signed a written *Miranda* waiver form, indicating that he understood and voluntarily waived those rights.

Detective Camp told Taylor that his arrest was related to his conduct in his former role as a dorm counselor at the Maryland School for the Deaf.  The detective stated that multiple students had accused Taylor of touching their breasts or buttocks on numerous occasions, of kissing them, and of exchanging intimate text messages with them.  Before the detective had provided the names of the accusers, Taylor brought up students named Da., S., and M., two of whom were among the initial complainants.  Later, the detective asked specific questions about De. and P.

Through the interpreter, Taylor at first denied making any inappropriate physical contact with students.  He stated that he may have made accidental contact with someone

---

[1] The Maryland Rules recognize relay or intermediary interpretation: "a deaf person who uses an idiosyncratic variation of sign language may require that a deaf and hearing interpreter be used as a team."  Md. Rules App'x: Explanations of Responses to *Voir Dire* Questions for Interpreters, Question 18 (2015).  "Deaf people with limited English or American Sign language skills often benefit from this type of arrangement." *Id.*

in the school hallways, which he described as crowded and narrow at certain points. He also stated that he would sometimes greet students with a handshake combined with a hug and that it was possible that his hand could have brushed against a person's chest. He admitted that he had exchanged text messages with a number of students and that some female students had sent him revealing photographs.

According to the interpreter's account of Taylor's statements, Taylor also stated that on specific instances he had accidentally touched particular girls. For example, according to the interpreter, Taylor admitted that he actually had touched Da. on the buttocks, but that he had done so by accident and had immediately apologized to her. In another instance, the interpreter reported that Taylor gave this response to questions about touching De.'s breast: "Right, I mean, maybe it was the brushing like everything else but it wasn't an intentional touch or anything. It was accidental. It wasn't, maybe it wasn't a complete hug." At trial and on appeal, Taylor has contested the accuracy of the interpreter's assertion that he admitted to specific incidents of inappropriate touching: he contends that he never admitted to having actually touched any of the young women's breasts or buttocks, but merely to have stated that *if* he had done so, it would have been an accident, for which he would have apologized.

At the detective's request, Taylor handwrote five short letters of apology addressed to Da., De., M., P., and S. Each letter expressed remorse and asked for forgiveness without describing any of Taylor's actual conduct. For instance, in his letter to Da., Taylor wrote: "I said really am sorry about you. I know that you dislike talk to me. I said so sorry about it situation. I wonder you can forgive me no matter what! . . . I want to

say to you 'Sorry'!"

When he finished writing, Taylor, through the interpreters, asked: "I wanted to know is the lawyer going to be coming to meet with me or can I ask for a lawyer now?" At that point, Detective Camp ended the questioning.

### C.    Pre-Trial Proceedings

On January 16, 2013, the State filed seven indictments against Taylor. Each indictment corresponded to one of seven complainants: Da., De., K., M., P., S., and T.[2] The State charged Taylor with one count of sexual abuse of a minor for each of the minors. *See* Md. Code (2001, 2012 Repl. Vol.), Criminal Law Art., § 3-602(b)(1) ("A . . . person who has permanent or temporary care or custody or responsibility for the supervision of a minor may not cause sexual abuse to the minor"); *id.* § 3-602(a)(4)(i) ("'Sexual abuse' means an act that involves sexual molestation or exploitation of a minor, whether physical injuries are sustained or not"). The State also charged Taylor with four counts of solicitation of child pornography. *Id.* § 11-207(a).

When Taylor's defense counsel first entered his appearance, he filed a generic "Omnibus Pre-Trial Defense Motion" that included a comprehensive list of unspecific and unsupported requests for relief. The State arranged for the detectives and the two sign-language interpreters from the interrogation to testify at the motions hearing. After the hearing was postponed for cause, however, Taylor's attorney failed to appear on the rescheduled hearing date. An attorney with no knowledge of the case appeared for the

---

[2] After Taylor's arrest, Detective Camp interviewed K. and T., two additional students whose names were later provided by the School.

sole purpose of requesting a postponement. After the court declined to postpone the hearing, the attorney withdrew all of Taylor's pre-trial motions.

The court then denied a written motion for another hearing on the issue of whether Taylor's statements to police should be suppressed. Taylor later filed a motion to sever, which the court also denied after a hearing.

### D.    The State's Case Against Taylor

A jury trial on all charges against Taylor commenced on October 28, 2013, and continued for nearly three weeks. Because the defendant and many of the witnesses are deaf, much of the testimony was communicated through court-appointed interpreters.[3]

The female students themselves were the primary witnesses against Taylor. Each of the seven students testified about specific instances of Taylor's inappropriate touching while they were under his supervision. According to many of the State's witnesses, Taylor used handshakes and hugs that are similar to other greetings commonly used at the Maryland School for the Deaf. While none of the witnesses disputed that touching plays an important role in communication among the deaf community, particularly for greetings or to get a person's attention,[4] the students claimed that Taylor performed the embraces in an unusual manner.

---

[3] *See generally* Md. Code (1974, 2013 Repl. Vol.), Courts and Judicial Proceedings Art., § 9-114; Md. Code (2001, 2008 Repl. Vol.), Criminal Procedure Art., §§ 1-202, 3-103; Md. Rule 1-333.

[4] *See, e.g.*, Maryland Governor's Office of the Deaf and Hard of Hearing, NETAC Tipsheet: Deaf Culture, *available at* http://odhh.maryland.gov/wp-content/uploads/sites/13/2014/10/TipsheetDeafCulture.pdf (last visited Dec. 23, 2015).

The other main source of evidence against Taylor was the recording of Taylor's interrogation. The recording included video of the sign-language communications between Taylor and the interpreters, as well as audio of the statements by the ASL interpreter, Mr. Smith, interpreting what Taylor had said in sign language. The State called Detective Camp to establish a foundation for admitting the recording with an accompanying transcript.

Taylor objected to the admission of the interpreter's words through the detective's testimony. He requested that the State call the interpreter, Mr. Smith, to verify his interpretations of what Taylor had told him. His counsel argued that "based on the Confrontation Clause" Taylor had the right to "confront the person who is saying these things" on the recording and to cross-examine "Mr. Joe Smith, as an interpreter interpreting what [Taylor] is saying." After commenting briefly that an interpreter was "not an accuser," the court overruled the objection. The detective then testified about some of the things that Taylor "said" to her in the interrogation even though she heard his words only as reported or interpreted by Smith.

Taylor renewed his objection immediately before the State attempted to play the recording for the jurors. At that point, defense counsel asked the court to direct one of the sworn court interpreters to give a live interpretation of Taylor's sign-language responses, rather than permit the jury to hear the account of an absent witness, Smith, about what Taylor had said. The defense also asked "to put on the record" that in *United States v. Charles*, 722 F.3d 1319 (11th Cir. 2013), the United States Court of Appeals held that a defendant has the right to cross-examine an interpreter who interpreted the

defendant's statements in a police interrogation. The court overruled the renewed objection.

The court then permitted the State to play the nearly five-hour recording. The State provided jurors with an audio transcript that Detective Camp had prepared. The first page noted that "throughout the interview, all statements attributed to both Clarence Taylor and [Certified Deaf Interpreter] Charm Smith are as interpreted through Joe Smith." The jurors received copies of the transcript with a cautionary instruction that they should consider only the video and audio as evidence.[5]

### E.     Taylor's Defense and the Conclusion of Trial

Taylor took the stand as the only witness in his defense. He denied any inappropriate touching of students. He testified that he could accidentally have made contact with a student's breasts or buttocks, but that he would have apologized if he had done so.

With respect to the statements attributed to him by the interpreter, Taylor repeatedly asserted that there were many "misinterpretations" and "miscommunications" between him and the interpreters. Taylor claimed that he had difficulty communicating with Smith at the beginning of the interview and that he had asked to have an attorney present during questioning. Taylor also claimed that he had never admitted during the interrogation to any specific instance of physical contact with a student.

---

[5] The State elicited testimony that Taylor requested photos of students through text messages and that some of the students replied with photos of themselves. The State withdrew the charges of solicitation of child pornography at the end of its case-in-chief.

The following exchange occurred during the State's cross-examination of Taylor:

Q:     [D]uring your interview with [Detective Camp], you stated several times that you did touch these girls but it was an accident. Correct?

A:     Well, let me clarify that first. There's some misunderstandings in that video. What I said is that it could have happened and if it did, it would have been an accident. I said it could have happened.

The prosecutor asked Taylor to explain specific portions from the transcript in which the interpreter said that Taylor had said that he had apologized to specific students after accidentally touching them. Taylor consistently responded that the interpreter had not correctly interpreted his sign-language statements. He testified that he told the interpreters that, *if* he had touched anyone, it would have been an accident, and he would have apologized.

In its closing argument, the State encouraged the jury to "[r]eally analyze th[e] interview." The prosecutor argued that the jury should conclude that Taylor voluntarily made all of the statements attributed to him by the interpreter." She further contended that Taylor's assertions that the interpreters made errors were not credible. Although the prosecutor encouraged the jury to disbelieve many portions of Taylor's responses from the interrogation, she pointed out that "finally towards the end of [the interview], he acknowledge[d] what he did," when the interpreter reported Taylor as admitting that he had touched the students, but claimed to have done so accidentally.

During its closing argument, the defense asked the jurors to remember that they "never heard from the actual interpreter." The State objected, and the court sustained that objection. Defense counsel then commented that, in assessing the weight of the

interpreted statements, the jury should consider that the interpreter had been paid by the police. The State then raised an "ongoing objection to any mention of the interpreters during that interview." The court sustained the objection once again, asserting that it was "not relevant" that the interpreter had been solicited by the police. The judge then instructed the jury that it could not consider "the last two comments [from defense counsel] concerning the interpreter."

After several days of deliberation, the jury reached a verdict as to three of the seven charges. The jury found Taylor guilty of sexually abusing two victims: Da. and De. The jury acquitted Taylor of the sexual abuse charge related to K. The jurors were unable to reach a verdict on the remaining counts for sexual abuse of P., M., S., or T.

The court denied Taylor's motion for new trial and sentenced him on January 31, 2013. The court imposed two consecutive sentences of 15 years of imprisonment, with all but three-and-a-half years of each sentence suspended, for a total term of seven years of incarceration. Taylor took a timely appeal from those judgments.

## QUESTIONS PRESENTED

Taylor now presents the following questions to this Court:

1. Was [Taylor's] constitutional right to confrontation violated when he was not given the opportunity to cross[-]examine the interpreter used by the police during his interrogation?

2. Did the trial court err in denying [Taylor's] requests for postponement and to reschedule a hearing on his motion to suppress statements?

3. Did the trial court err in joining the seven charges against [Taylor] into one trial?

-10-

4.      Did the trial court err in refusing to permit [Taylor] to cross-examine the victims' parents about their pursuit of a civil suit?

5.      Did the trial court err in denying [Taylor's] requests to subpoena witnesses?

Answering the first question, we conclude that the trial court committed reversible error when it admitted the interpreter's extrajudicial account of Taylor's statements after Taylor had asserted his rights under the Confrontation Clause.  We shall address the remaining issues to the extent that they are likely to recur at Taylor's second trial.

## DISCUSSION

## I.

Taylor contends that the trial court erred when it admitted Smith's English-language interpretations of Taylor's sign-language statements.  According to Taylor, the admission of the interpreted statements, under circumstances where he had no opportunity to cross-examine the interpreter during the State's case against him, violated his constitutional right to be confronted with the witnesses against him.

We review the ultimate question of whether the admission of evidence violated a defendant's constitutional rights without deference to the trial court's ruling.  *See Hailes v. State*, 442 Md. 488, 506 (2015) (applying de novo standard of review to appeal based on Confrontation Clause).

### A.      Constitutional Right of Confrontation in Criminal Proceedings

The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]"  In this context, confrontation means more than simply a face-to-face

-11-

meeting between accusers and the accused. *Davis v. Alaska*, 415 U.S. 308, 315 (1974). The "main and essential purpose" of the Confrontation Clause is to ensure that the defendant has an opportunity for effective cross-examination of adverse witnesses, "which cannot be had except by the direct and personal putting of questions and obtaining immediate answers." *Id.* at 315-16 (citations and quotation marks omitted). During an in-person cross-examination, "the accused has an opportunity, not only of testing the recollection and sifting the conscience of witnesses, but of compelling him to stand face to face with the jury in order that they may look at him, and judge his demeanor upon the stand and in the manner in which he gives his testimony whether he is worthy of belief." *Mattox v. United States*, 156 U.S. 237, 242-43 (1895).

Because the safeguard of cross-examination is essential to a fair trial, the right of confrontation is a fundamental right that applies during state as well as federal prosecutions. *Pointer v. Texas*, 380 U.S. 400, 403 (1965).

In Maryland, the constitutional right of confrontation predates the federal Constitution. Article XIX of the Maryland Declaration of Rights of 1776 declared that "in all criminal prosecutions, every man hath a right . . . to be confronted with the witnesses against him[] . . . [and] to examine the witnesses for and against him on oath[.]" Identical language is currently embodied in Article 21 of the Maryland Declaration of Rights. Maryland's confrontation right is interpreted to "generally provid[e] the same protection to defendants" as its federal counterpart. *Derr v. State*, 434 Md. 88, 103 & n.11 (2013) (citations omitted), *cert. denied*, 134 S. Ct. 2723 (2014); *see Cooper v. State*, 434 Md. 209, 232 (2013).

The dual confrontation clauses of the Bill of Rights and the Maryland Declaration of Rights focus upon a singular category of persons: the "witnesses against" a defendant. This group naturally includes the persons formally called by the State to testify against the defendant at trial. The text of these provisions, however, does not indicate the extent to which a prosecutor may introduce the out-of-court statements of persons who do not testify in the prosecution's case at trial.

In the landmark case of *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court redefined many of the core principles for evaluating whether a criminal defendant has the right to require the prosecution to produce the declarants of extrajudicial statements so that the defendant can confront and cross-examine them. Our analysis begins with *Crawford*, the opinion that essentially "'rewrote confrontation clause analysis.'" *State v. Norton*, 443 Md. 517, 524 n.8 (2015) (quoting 6A Lynn McLain, *Maryland Evidence: State and Federal* § 800:5 (3d ed. 2013)).

The defendant in that case, Michael Crawford, stabbed a man. *Crawford*, 541 U.S. at 38. Crawford's wife, Sylvia, witnessed the stabbing. *Id.* At trial, Crawford's wife did not testify, "because of the state marital privilege, which generally bars a spouse from testifying without the other spouse's consent." *Id.* at 40. The trial court nevertheless allowed the State to introduce a recording of statements from a police interrogation, in which Sylvia Crawford arguably undermined her husband's claim of self-defense. *Id.* The Supreme Court ultimately determined that the use of Ms. Crawford's statements at Crawford's trial, where Crawford had no opportunity to cross-examine her, violated his rights under the Confrontation Clause. *Id.* at 68-69.

In an opinion by Justice Scalia, the Supreme Court looked to the historical background of the Confrontation Clause in an effort to understand its meaning. *Id.* at 43. According to the Court, the Confrontation Clause emerged out of the response to controversial criminal trial practices in England and in the American colonies that departed from "[t]he common-law tradition . . . of live testimony in court subject to adversarial testing[.]" *Id.* (citing 3 William Blackstone, *Commentaries on the Laws of England* 373-74 (1768)). During the sixteenth, seventeenth, and eighteenth centuries, criminal tribunals sometimes admitted transcripts from pretrial examinations, in which witnesses had been questioned in private by judicial officers. *Crawford*, 541 U.S. at 43-48. "Through a series of statutory and judicial reforms, English law developed a right of confrontation that limited these abuses." *Id.* at 44. Declarations of rights adopted by Maryland and other states, and eventually the federal Bill of Rights, guaranteed a confrontation right to secure this common-law safeguard. *Id.* at 48-49.

From this history, the Court inferred that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." *Id.* at 50. The Court then construed the Clause's text in light of that historical purpose:

> The text of the Confrontation Clause reflects this focus. It applies to "witnesses" against the accused — in other words, those who "bear testimony." 2 N. Webster, An American Dictionary of the English Language (1828). "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Ibid.* An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not. The constitutional text, like the history underlying the common-law right of confrontation, thus reflects an

-14-

especially acute concern with a specific type of out-of-court statement. *Id.* at 51.

The Court concluded that the right of confrontation attaches to hearsay statements that are "testimonial." *Id.* Without selecting any "comprehensive definition of 'testimonial,'" the Court reasoned that the term "applies at a minimum . . . to police interrogations," which are among "the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." *Id.* at 68. The Court specifically noted that "[p]olice interrogations bear a striking resemblance to examinations by justices of the peace in England," who performed "an essentially investigative and prosecutorial function" in producing evidence from witnesses who were not always under oath. *Id.* at 52-53. Consequently, the Court held that the recorded statements from the interrogation of Crawford's wife were testimonial. *Id.* at 68.

As part of its analysis, *Crawford* expressly repudiated a prior test that had premised the admissibility of unconfronted hearsay upon judicial determinations of reliability. In so doing, the Court overruled *Ohio v. Roberts*, 448 U.S. 56 (1980), which had held that it did not violate the Confrontation Clause to admit hearsay statements from a declarant who was not present for cross-examination, as long as the declarant was unavailable, and the statement either fell "within a firmly rooted hearsay exception" or bore "particularized guarantees of trustworthiness." *Crawford*, 541 U.S. at 66. *Crawford* emphatically rejected the notion that courts can employ general hearsay exceptions or the "indicia or reliability" of an out-of-court statement to dispense with a defendant's right to require the prosecution to produce the witnesses against him or her so that they could be

subjected to cross-examination. *See id.* at 51, 61. Reasoning that the Clause permits "only those exceptions established at the time of the founding,"[6] the Court held that testimonial hearsay from an absent witness is generally admissible against a criminal defendant only if the declarant is unavailable, and the defendant had a prior opportunity to cross-examine that witness. *Id.* at 54.

Taylor had no pre-trial opportunities to cross-examine the sign-language interpreter, Joe Smith, about his interpretation of what Taylor had communicated to him. The State neither asserted nor made any showing that Smith was unavailable, and the court made no finding of the witness's unavailability. Accordingly, our reasoning here turns on whether the challenged statements are testimonial hearsay under *Crawford* and its progeny.

For over a decade, the Supreme Court has developed and refined its analysis of what *Crawford* called "testimonial hearsay." The Court has consistently declined to offer any exhaustive definition, but cases that have determined whether a statement is testimonial fall into two main categories.

---

[6] The Supreme Court has expressly acknowledged only two exceptions to the right of confrontation that were established at the time the Sixth Amendment was ratified. The first exception is for "declarations made by a speaker who was both on the brink of death and aware that he was dying." *Giles v. California*, 554 U.S. 353, 358 (2008); *see Hailes*, 442 Md. at 506-14. A second founding-era doctrine, forfeiture by wrongdoing, "permitted the introduction of statements of a witness who was 'detained' or 'kept away' by the 'means or procurement' of the defendant." *Giles*, 554 U.S. at 359. The Court has entertained a possible exception for one class of evidence that "though prepared for use at trial, was traditionally admissible" without confrontation: a clerk's certificate to authenticate an official record or copy of an official record. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 322-23 (2009).

-16-

The first series of cases, flowing directly from *Crawford*, involves oral statements given in response to questioning from government actors. *See Davis v. Washington*, 547 U.S. 813, 826-29 (2006) (phone conversation between domestic violence victim and 911 operator was not testimonial because its primary purpose was to enable police to meet an ongoing emergency); *id.* at 829-32 (in a consolidated case *Hammon v. Indiana*, victim's statement describing domestic abuse to police at crime scene shortly after assault was testimonial because there was no emergency, and the primary purpose was to investigate a possible crime); *Michigan v. Bryant*, 562 U.S. 344, 370-78 (2011) (statements from mortally-wounded shooting victim to officers responding at scene were not testimonial because the primary purpose was to meet an ongoing emergency and to ascertain whether the shooter posed a threat to the police and public, and because the questioning lacked formality); *Ohio v. Clark*, 135 S. Ct. 2173, 2181-82 (2015) (child-abuse report from three-year-old to preschool teachers was not testimonial because it was not made for the primary purpose of creating evidence, but of meeting an ongoing emergency involving suspected abuse); *see also Giles v. California*, 554 U.S. 353, 356-58 (2008) (assuming without deciding that abuse victim's report to police was testimonial).

The second line of cases concerns written reports, solicited by state actors and created specifically to serve as evidence in a criminal case. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309-11 (2009) (affidavits from state laboratory technicians certifying composition and amount of seized drug sample were testimonial); *Bullcoming v. New Mexico*, 131 S. Ct. 2705, 2716-17 (2011) (unsworn forensic report certifying blood-alcohol concentration of seized blood sample was testimonial); *Williams v. Illinois*,

132 S. Ct. 2221, 2242-44 (2012) (plurality opinion determining that DNA profile report from independent laboratory was not testimonial).

The statements of an interpreter hired by police to assist in a station-house interrogation do not fit neatly into just one of these two categories. The Supreme Court has neither decided nor commented upon the issue that we face here: whether the interpreter's statements about what the defendant said qualify as "testimonial." Nevertheless, the Supreme Court's post-*Crawford* jurisprudence, when viewed in its entirety, supplies the tools needed to answer that question.

**B.      Inquiries Derived from *Crawford* and Other Interrogation Cases**

In *Norton*, the Court of Appeals' most recent opinion analyzing testimonial hearsay, the Court identified a number of inquiries that can be derived from *Crawford* and its successors. First of all, "[t]o whom the statement is made is a key component" in determining whether a statement is testimonial. *Norton*, 443 Md. at 530; *accord Clark*, 135 S. Ct. at 2182; *Bryant*, 562 U.S. at 369. Because the involvement of government officials performing an investigative function implicates the core concerns of the Confrontation Clause (*Crawford*, 541 U.S. at 52-53, 56 n.7; *Bryant*, 562 U.S. at 358), statements made to law enforcement officers "principally charged with uncovering and prosecuting criminal behavior" are significantly more likely to be considered testimonial than statements made to others. *See Clark*, 135 S. Ct. at 2182.

A concomitant inquiry looks to the purpose of the statement, specifically "whether, when viewed objectively, the challenged statement was 'made for the purpose of establishing or proving some fact' in a criminal prosecution or investigation." *Norton*,

443 Md. at 531 (quoting *Crawford*, 541 U.S. at 51). Typically, statements made in response to questions from law enforcement "are testimonial when the circumstances objectively indicate" that there is no ongoing emergency requiring police assistance "and that the primary purpose of the interrogation is to establish or to prove past events potentially relevant to later criminal prosecution." *Davis*, 547 U.S. at 822. This primary purpose determination "requires a combined inquiry that accounts for both the declarant and the interrogator" and looks to "the contents of both the questions and the answers." *Bryant*, 562 U.S. at 367-68. Not only "[t]he identity of an interrogator" but also "the content and tenor of [the] questions can illuminate the primary purpose of the interrogation." *Id.* at 369 (citations and quotation marks omitted).

In this case, "[i]t is entirely clear from the circumstances that the interrogation was part of an investigation into possibly past criminal conduct[.]" *Davis*, 547 U.S. at 829; *see also State v. Lucas*, 407 Md. 307, 319 (2009). The main interrogator here, Detective Camp, was a law enforcement officer whose primary job responsibility was to investigate sexual abuse and similar crimes. The challenged statements were "made in the course of a criminal investigation initiated by the government[.]" *State v. Snowden*, 385 Md. 64, 81 (2005) (citing *Crawford*, 541 U.S. at 50-52). Both the questions and answers from the interview sought to establish facts related to Taylor's possibly criminal actions from over a year earlier. The exchange took place "some time after the events were over," and it was designed to elicit "what happened," in the past tense. *Davis*, 547 U.S. at 830. Although we can imagine situations in which an interpreted interview might seek to resolve some ongoing emergency involving the abuse of minors (*e.g., Clark*, 135 S. Ct. at

2181), any such emergency had ended long before the arrest, when the School removed Taylor from his custodial role. In sum, "[o]bjectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime[.]" *Davis*, 547 U.S. at 830.[7]

In *Williams v. Illinois*, 132 S. Ct. 2221 (2012), a plurality of the Supreme Court endorsed a more restrictive version of the primary purpose test. *Williams* involved a laboratory report that analyzed DNA from a semen sample that had been recovered from a rape victim. Justice Alito and three other justices concluded that the report was not testimonial because "[i]t plainly was not prepared for the primary purpose of accusing a targeted individual," but rather "to catch a dangerous rapist who was still at large." *Id.* at 2243. The Maryland Court of Appeals has held that a statement is testimonial if it has a basic evidentiary purpose and if it satisfies Justice Alito's "targeted accusation" test. *See Norton*, 443 Md. at 542-47 (analyzing *Young v. United States*, 6 A.3d 1033 (D.C. 2013)). Even under this narrowly defined test of the primary purpose, however, the challenged statements in this case qualify as testimonial -- the police were not seeking to apprehend a sexual predator who was still at large; they were interviewing the lone suspect, who was

---

[7] The Supreme Court has commented: "In making the primary purpose determination, standard rules of hearsay, designed to identify some statements as reliable, will be relevant." *Bryant*, 562 U.S. at 358-59. In *Bryant*, the Court recognized that some statements that fall into hearsay exceptions, such as excited utterances, are typically not made for any evidentiary or prosecutorial purpose. *See id.* at 361. As an illustration here, if the interpreter suddenly exclaimed, "Taylor's pointing a gun at me!" during the interrogation, then that utterance would not be testimonial even though it was made within a testimonial setting. By contrast, the primary purpose of the challenged statements in this case was to "creat[e] an out-of-court substitute for trial testimony." *Id.* at 358.

-20-

already under arrest.

Other inquiries for evaluating a statement's testimonial nature focus less on the parties involved in the exchange and more on the objective circumstances surrounding the statement. The Court of Appeals directs us to examine whether the statement was solicited "under circumstances that 'would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Norton*, 443 Md. at 531 (quoting *Crawford*, 541 U.S. at 52). A related "query from *Crawford* is whether the statement under scrutiny was made in a formal context." *Norton*, 443 Md. at 531. This evaluation "may turn on the form of the statement as well as other circumstances involving the creation of the statement, such as if it was offered in the confines of a police interview room." *Id.* at 531-32 (citing *Crawford*, 541 U.S. at 52-53); *e.g., Bryant*, 562 U.S. at 362 (distinguishing informal and disorganized questioning in exposed public area from the "formal station-house interrogation in *Crawford*").

Looking to these objective circumstances, an ordinary person in the interpreter's position would have anticipated that the "statements to the sexual abuse investigator" about what the suspect, Taylor, had said "potentially would have been used to 'prosecute' [Taylor]." *Snowden*, 385 Md. at 84; *cf. Clark*, 135 S. Ct. at 2181-82 (child's report to preschool teachers was non-testimonial where the child neither was informed nor intended nor understood that his statements would be used by police or prosecutors). Taylor's interview was characterized by precisely the level of formality as the questioning of Sylvia Crawford, which "followed a *Miranda* warning, was tape recorded, and took place at the station house." *Davis*, 547 U.S. at 830 (citing *Crawford*, 541 U.S.

-21-

at 53 n.4.).  When the detective told Smith to inform Taylor that "anything [he] sa[id]" could be used against him, a reasonable person in the interpreter's position would expect that his English interpretations of Taylor's statements would also be used prosecutorially. *See Davis*, 547 U.S. at 837-38 (Thomas, J., concurring).[8]

In a series of single-author concurring opinions, Justice Thomas has advocated a test that does not look to the purpose of the out-of-court statement, but to whether the statement falls into a recognized category of formalized evidentiary materials. *See Clark*, 135 S. Ct. at 2185-86 (concurring in judgment); *Bryant*, 562 U.S. at 378-79 (concurring in judgment); *Melendez-Diaz*, 557 U.S. at 329-30 (concurring); *Giles*, 554 U.S. at 377-78 (concurring); *Davis*, 547 U.S. at 823 (concurring in judgment and dissenting in part). According to Justice Thomas, "the Confrontation Clause regulates only the use of statements bearing 'indicia of solemnity.'" *Williams*, 132 S. Ct. at 2259 (Thomas, J., concurring) (quoting *Davis*, 547 U.S. at 837 (Thomas, J., concurring)).  Justice Thomas's rationale gained greater importance when he cast the deciding vote in *Williams v. Illinois*. *See Norton*, 443 Md. at 546-47; *Derr*, 434 Md. at 114-15.  Speaking generally, Justice Thomas has "concluded that the Confrontation Clause reaches . . . statements resulting from formalized dialogue, such as custodial interrogation." *Williams*, 132 S. Ct. at 2260 (Thomas, J., concurring) (citations and quotation marks omitted).  Although Justice

---

[8] Additional comments from Detective Camp would have eliminated any possible doubt as to whether the interview responses would be used against Taylor.  She stated: "Let me tell you what my role is.  I'm a police detective.  I gather information, I present it to the court, and they decide if you should be charged or not.  Once they decide, okay, there is something that you might be able to be charged with then, that's why an arrest warrant is issued.  At that point, it goes to the judge to determine if you're guilty or not."

Thomas did not write separately in *Crawford*, he later identified the *Miranda* warning as the most important indicia of solemnity in that case. *See Davis*, 547 U.S. at 837-38 (Thomas, J., concurring) (explaining that a warning that statements may be used in court "imports a solemnity to the process that is not present in a mere conversation between a witness and a suspect or a police officer"). Under the circumstances here, the structured police questioning after a *Miranda* warning carried as much formality and solemnity as the interrogation from *Crawford*.

Indeed, outside of a courtroom setting, it is difficult to imagine any facts that would have increased the formality of the interpreter's statements about what Taylor had said. Perhaps the detective could have asked Smith to "swear or affirm under the penalties of perjury to interpret accurately, completely, and impartially[.]" Md. Rule 1-333(d)(3) (oath for court interpreters); *see also* Fed. R. Evid. 604. The Supreme Court, however, has clearly established that unsworn statements may be testimonial. *Crawford*, 541 U.S. at 52 (explaining that "absence of oath [is] not dispositive"); *see Davis*, 547 U.S. at 826; *see also Bullcoming*, 131 S. Ct. at 2717 (rejecting as "implausible" and "untenable" a construction of the Sixth Amendment that would sanction unfettered use of unsworn evidentiary materials). In any event, even without taking such an oath, professional sign-language interpreters (as opposed to ordinary citizens) typically have an ethical if not legal duty to "[r]ender the message faithfully by conveying the content and spirit of what is being communicated." *See* National Association for the Deaf and Registry of Interpreters for the Deaf, Code of Professional Conduct, *available at*

-23-

http://www.rid.org/ethics/code-of-professional-conduct/ (last visited Dec. 23, 2015).[9]

In sum, the relevant inquiries from *Crawford* lead us to conclude that the interpreter's statements about what Taylor had said were testimonial. The interpreter, responding to a police request, made recorded statements, inside a police interview room, to detectives investigating Taylor's past criminal conduct, and for the purpose of producing evidence that might be used to prosecute Taylor. "Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial." *Davis*, 547 U.S. at 830 (emphasis in original).

## C.     Possible Justifications for an Interpreter Exception to *Crawford*

The context for Smith's statements was equivalent to the context of the testimonial statements made in *Crawford*. The content of the interpreter's testimony, however, was markedly different. Even accepting that Smith was a "witness" for Sixth Amendment purposes, an interpreter is not the same type of witness as Sylvia Crawford was. Consequently, we need to inquire whether language specialists such as Smith fall into some special category of witnesses who are exempt from cross-examination.

For instance, in admitting Smith's statements at Taylor's trial, the trial judge

---

[9] An additional component of *Crawford*'s analysis "involves whether there is historical authority for the admission of the challenged statement, despite its testimonial nature." *Norton*, 443 Md. at 532. The interpreter's statements here do not fit any of the exceptions that the Supreme Court has identified. *See supra* n. 6.

-24-

commented that the interpreter was "not an accuser" in the ordinary sense.[10] Smith was not recalling any events he had observed at the Maryland School for the Deaf, but was speaking almost simultaneously as he observed Taylor inside the interview room. The interpreter himself was not under interrogation, but was only responding to an open-ended request to relate what Taylor was expressing in sign language. As the State contends, the overall accuracy of Smith's interpretations could have been tested (perhaps fairly enough) through other witnesses such as Detective Camp, Taylor himself, or even sign-language experts called by the defense. The State also contends that, if Taylor indeed believed that Smith's live testimony was particularly important, he could have used his subpoena power to call Smith as a defense witness.

*Crawford* does not directly address these arguments. Looking solely at *Crawford* and other cases involving official interrogations, we have little guidance to determine whether these distinctions might remove an interpreter from the constitutional category of the "witnesses against" a defendant. Nevertheless, in *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), and *Bullcoming v. New Mexico*, 131 S. Ct. 2705 (2011), the Supreme Court considered and rejected each one of those potential justifications for reading such an exemption into the Confrontation Clause.

In *Melendez-Diaz*, the Court "refused to create a 'forensic evidence' exception" to the confrontation requirement. *Bullcoming*, 131 S. Ct. at 2713 (citing *Melendez-Diaz*,

---

[10] The word "accuser" appears in neither the Sixth Amendment nor its Maryland predecessor. The term did appear in the original proposal for constitutional amendments that James Madison submitted to the First Congress.

557 U.S. at 317-21).  Melendez-Diaz challenged the admission of statements from non-testifying forensic experts reporting the results of chemical analysis that identified a seized substance as cocaine of a specific quantity.  *Melendez-Diaz*, 557 U.S. at 307-09.  The analysts made those statements in sworn certificates, created solely for an evidentiary purpose in response to a police request.  *Id.* at 310-11.  In what it called a "rather straightforward application" (*id.* at 312) of the *Crawford* rule, a majority of the Court concluded that "the analysts' affidavits were testimonial statements, and the analysts were 'witnesses' for purposes of the Sixth Amendment."  *Id.* at 311.

*Bullcoming*, 131 S. Ct. at 2709-11, concerned an unsworn laboratory report that certified the machine-generated results of a blood-alcohol concentration test and asserted that the analyst had followed proper protocol.  The Court reasoned that its "precedent cannot sensibly be read in any other way" than to dictate the conclusion that "when the State elected to introduce [the analyst's] certification, [the analyst] became a witness [whom] Bullcoming had the right to confront."  *Id.* at 2716.  The Court also rejected the argument that the state could introduce the analysts' statements through a second expert who was familiar with the general testing procedures, but who had not performed or observed the test.  *Id.* at 2709, 2714-15.  Together, the Court's opinions in *Melendez-Diaz* and *Bullcoming* systematically rejected a series of justifications for creating an exemption to the Confrontation Clause for experts who analyze evidence for police.

In the former case, Massachusetts had argued that its chemical analysts were not "witnesses against" Melendez-Diaz because they were not "'accusatory' witnesses, in that they [did] not directly accuse [him] of wrongdoing[.]"  *Melendez-Diaz*, 557 U.S. at 313.

As the Supreme Court explained, however, the Sixth Amendment contemplates only two categories of witnesses in relation to a criminal defendant: the "witnesses against him" in the Confrontation Clause; and the "witnesses in his favor" in the Compulsory Process Clause. *Id.* "The prosecution *must* produce the former; the defendant *may* call the latter." *Id.* at 313-14 (emphasis in original). There can be no "third category of witnesses, helpful to the prosecution, but somehow immune from confrontation." *Id.* at 314. Thus, even though Smith did not personally accuse Taylor of doing anything other than giving certain responses to questions, the interpreter nonetheless became a "witness against" Taylor when the State offered the interpreter's extrajudicial account of Taylor's statements against Taylor in his prosecution. *See id.* at 313-14; *Bullcoming,* 131 S. Ct. at 2716.

The *Melendez-Diaz* Court dismissed the notion that expert analysts do not qualify as "witnesses against" a defendant simply because the persons who analyze evidence often report "'near-contemporaneous observations'" rather than recalling "'events observed in the past[.]'" *Melendez-Diaz,* 557 U.S. at 315 (quoting *id.* at 345 (Kennedy, J., dissenting)). Finding no justification to import that temporal distinction into the Sixth Amendment, the Court reasoned that the right of confrontation reaches even those statements that could be treated as present-sense impressions. *See id.* at 316 (citing *Davis,* 547 U.S. at 820). Consequently, it makes no difference here that, in giving his account of what Taylor had said, the interpreter was consulting his short-term memory of Taylor's near-contemporaneous sign-language communications rather than his long-term memory.

-27-

In a similar regard, the Supreme Court rejected the suggestion that witnesses are not "witnesses against" a defendant if "they 'observe[] neither the crime nor any human action related to it.'" *Melendez-Diaz*, 557 U.S. at 316 (quoting *id.* at 345 (Kennedy, J., dissenting)). The Court found "no authority for this particular type of limitation," noting that such a "novel exception . . . would exempt all expert witnesses." *Id.* at 316. Accordingly, the interpreter does not escape confrontation simply because he, like the chemists and technicians who produced the evidence used against Melendez-Diaz and Bullcoming, did not personally observe any criminal act.

Furthermore, the Court in *Melendez-Diaz* was unpersuaded by the argument that the assertions of the expert analysts were non-testimonial because the analysts were not responding to direct questions from law enforcement. The Court explained that a witness still "bears testimony" even when that testimony is volunteered or given in response to an open-ended inquiry. *Id.* at 316 (citing *Davis*, 547 U.S. at 822-23 n.1). A comparable argument fared no better in *Bullcoming*, when New Mexico attempted to exempt a laboratory analyst from confrontation by arguing that his report was not "'adversarial'" or "'inquisitorial[.]'" *Bullcoming*, 131 S. Ct. at 2717. Even a simple police request to "'write down what happened' suffices to trigger the Sixth Amendment's protection[.]" *Melendez-Diaz*, 557 U.S. at 317 (quoting *Davis*, 547 U.S. at 819-20). Here, Smith's extrajudicial account of what Taylor said is no less testimonial because he delivered his account in response to a general request from police to interpret Taylor's answers into English.

In *Melendez-Diaz*, 557 U.S. at 317, Massachusetts argued that confrontation rights

are not implicated when a witness's testimony results from "neutral, scientific testing." The State of New Mexico later echoed that argument, asserting that Bullcoming had no right to cross-examine a laboratory analyst because that analyst had recorded an objective fact when he transcribed a machine-produced result. *Bullcoming*, 131 S. Ct. at 2714. In both instances, the Court reiterated *Crawford*'s core holding that the substantive reliability of the admitted evidence is not a valid basis for ignoring the specific procedural right guaranteed by the Constitution. *See id.* at 2715 (citing *Crawford*, 541 U.S. at 62); *Melendez-Diaz*, 557 U.S. at 317-18 (quoting *Crawford*, 541 U.S. at 61-62).

Adopting an approach much like that of the unsuccessful states in *Melendez-Diaz* and *Bullcoming*, the State attempts to minimize the role of the interpreter in this case. According to the State's brief, the interpreter, Smith, was "merely a relay for Taylor's own statements," "simply conveying, in a different language" Taylor's testimony, or "simply relating the statements of the defendant" rather than "providing his own independent statements." In other words, the State contends that the interpreter was "simply" or "merely" interpreting. These repeated assertions are less a legal argument and more of a rhetorical exercise in characterization. It is not enough for our constitutional analysis to select a synonym for "interpreting" and then to attach the adverb "merely" or "simply" to it.

In our view, the State's contention that Smith served as "merely a relay" is no more persuasive than the faulty assertion of the Supreme Court of New Mexico that a forensic lab technician served as a "'mere scrivener,'" who did nothing more than record the results of a machine-generated test. *See Bullcoming*, 131 S. Ct. at 2714 (citation

-29-

omitted); *see also id.* at 2715 (rejecting premise that analyst's task "called for no interpretation or exercise of independent judgment"). The Supreme Court declined to uphold the reasoning of the New Mexico court, which had taken the view that "Bullcoming's true accuser" (*id.* at 2714 (citations and quotation marks omitted)) was the machine that produced the test results, and which had reasoned that Bullcoming could not cross-examine that machine. *Id.* at 2713 (citations omitted). The State's argument here, not coincidentally, follows that same pattern, by contending that the only "witness is the defendant [Taylor], not the interpreter [Smith]," and that Taylor has "no Sixth Amendment right to confront himself."

In dicta, the Supreme Court in *Bullcoming* went on to explain that even an officer's report of an "objective fact" such as "the address above the front door of a house or the read-out of a radar gun" cannot be admitted against an accused through testimony of someone other than the officer who personally made the observations. *Id.* at 2714. By analogy, Smith would be subject to cross-examination in the State's case even if we were to imagine that he were operating some kind of sign-language interpretation machine and reading the output for the detectives. Those testimonial statements could not be admitted through a person such as Detective Camp, who by her own admission had no knowledge of the meaning of Taylor's answers aside from what she heard from Smith. *See id.*; *see also Davis*, 547 U.S. at 826 ("the protections of the Confrontation Clause" may not "readily be evaded by having a note-taking policeman *recite* the . . . hearsay testimony of the declarant") (emphasis in original).

In essence, the State asks us to reason that, in converting a person's statements

-30-

from one language to another, an interpreter does not assert anything at all. To the contrary, Smith made representations each time he translated statements from one language to another. *See, e.g.*, *State v. Rodriguez-Castillo*, 345 Or. 39, 47 (2008) (rejecting state's argument that interpreter makes no independent assertions when interpreter converts statements between languages). For example, one portion of the interrogation transcript contains this simple exchange:

DET. CAMP:      What about when you hug the girls?

[TAYLOR]:      Yes. I do, we do hug.

The actual speaker of that answer was not Taylor, a man who literally does not and cannot enunciate spoken words in the English language. Rather, the speaker was the interpreter, Smith, attributing the response to Taylor. In the example above, two declarants made testimonial assertions: Taylor made a declaration in sign language; and then Smith, in his interpretation of Taylor's sign-language declaration, declared that Taylor had said that he (Taylor) had hugged the female students. Taylor is the declarant of his sign-language responses (recorded on the video), and Smith is the declarant of his English interpretations of Taylor's responses (recorded on the audio). *See Rodriguez-Castillo*, 345 Or. at 47; *State v. Terrazas*, 162 Ariz. 357, 359 (Ariz. App. 1989) (quoting *State v. Letterman*, 47 Or. App. 1145, 1148 (1980)); *accord United States v. Charles*, 722 F.3d 1319, 1324 (11th Cir. 2013).[11]

---

[11] It is true that the interpreter Smith did not explicitly preface each answer by saying: "I have conveyed a faithful interpretation of your question in sign language to the subject, and in my opinion here is the most faithful English interpretation of the meaning of the subject's response." For the sake of simplicity and clarity, an interpreter does not

-31-

By treating Smith as nothing more than a neutral mouthpiece through which Taylor's messages passed without being affected in any way, the State asks us to endorse a fallacy or misconception that ignores the reality of language interpretation. Translating or interpreting another language into English is no "simple" task:

> "An interpreter must listen to what is being said, comprehend the message, abstract the entire message from the words and the word order, store the idea, search his or her memory for the conceptual and semantic matches, and reconstruct the message (keeping the same register or level of difficulty as in the source language). While doing this, the interpreter is speaking and listening for the next utterance of the language to process, while monitoring his or her own output."

*State v. Montoya-Franco*, 250 Or. App. 665, 672 (2012) (quoting Cathy Rhodes, *Court Certification*, 1 Access to Justice Journal 1, 2 (Summer 1999)).

"Some judges and attorneys have a mistaken belief than an interpreter renders . . . proceedings word for word, but this is impossible because there is not a one-to-one correspondence between words or concepts in different languages." National Association of Judicial Interpreters and Translators, FAQ About Court and Legal Interpreting and Translating, http://www.najit.org/certification/faq.php#judiciary (last visited Sept. 1, 2015); *accord* Md. Rules App'x: Explanations of Responses to *Voir Dire* Questions for Interpreters, Question 27 (2015) ("Verbatim [or] 'word-for-word' [interpretation] . . . is impossible in interpreting since it would necessitate a disregard for grammar and other features unique to a language. . . A proper interpretation will retain the mood, tone,

---

unnecessarily repeat those introductory portions hundreds of times throughout a conversation. The surplus verbiage is implied by the context of the exercise of translation.

nuances, and meaning of the speaker to the extent that the target language has an appropriate equivalent").

American Sign Language is no different from foreign languages in this respect. "American Sign Language (ASL) is a complete, complex language that employs signs made by moving the hands combined with facial expressions and postures of the body." National Institute on Deafness and Other Communication Disorders, American Sign Language Fact Sheet, at 1 (Feb. 2015), *available at* http://www.nidcd.nih.gov/ staticresources/health/hearing/MIDCD-American-Sign-Language.pdf (last visited Dec. 23, 2015). "ASL is a language completely separate and distinct from English. It contains all the fundamental features of language – it has its own rules for pronunciation, word order, and complex grammar. . . . For example, English speakers ask a question by raising the pitch of their voice; ASL users ask a question by raising their eyebrows, widening their eyes, and tilting their bodies forward." *Id.* at 2. Specific ways of communicating ideas in ASL vary as a result of regional variation, factors such as age and ethnicity, and individual differences in expression. *See id*. The absence of any direct equivalence between sign-language expressions and spoken English sentences is the very reason that the police required the services of the Certified Deaf Interpreter, Charm Smith, during the interrogation.

Recognizing the high level of education, knowledge, skills, and judgment needed to produce faithful interpretations between English and sign language, Maryland typically requires that court interpreters of sign language undergo a rigorous certification process. *See generally* Md. Rule 1-333; Md. Rules App'x: Explanations of Responses to *Voir Dire*

-33-

Questions for Interpreters, Questions 11-12 (2015); Registry of Interpreters for the Deaf, National Interpreter Certification (NIC), http://www.rid.org/rid-certification-overview/nic-certification/ (last visited Dec. 23, 2015). The interpreters' primary role is "to apply their best skills and judgment to preserve faithfully the meaning of what is said[.]" *See* Maryland Administrative Office of the Courts, Maryland Court Interpreter Handbook, at 10 (July 2015), *available at* http://www.courts.state.md.us/interpreter/ (last visited Dec. 23, 2015); *accord* National Association of the Deaf and Registry of Interpreters for the Deaf, Code of Professional Conduct, *available at* http://www.rid.org/ethics/code-of-professional-conduct/ (last visited Dec. 23, 2015) (guiding professional interpreters to "exercise judgment, employ critical thinking, apply the benefits of practical experience, and reflect on past experience in the practice of their profession").

The English words that the jurors ultimately heard in this case were not the words of Taylor, but of Smith, expressing his opinion as to a faithful reproduction of the meaning of Taylor's sign-language expressions. As this Court observed in another case in which a witness testified about the meaning of out-of-court statements spoken by a defendant in a foreign tongue: "To the extent to which someone translates words [from a non-English language] into English, the rendering of an opinion is inherent in the situation." *Malekar v. State*, 26 Md. App. 498, 508 (1975).

In *Melendez-Diaz*, 557 U.S. at 318-21, Massachusetts argued for an exception to the Confrontation Clause by contending that requiring confrontation for forensic experts would have little or no utility in a criminal trial. The Supreme Court rejected that

premise and identified a number of ways in which cross-examination might expose false or inaccurate testimony regarding scientific testing, such as dishonesty, bias, errors, incompetence, or deficiencies in the expert's training, judgment, or methodology. *See id.* at 318-21; *see also Bullcoming*, 131 S. Ct. at 2715 (reasoning that absence of cross-examination of technician deprived Bullcoming of opportunity to "expose any lapses or lies" or to show the technician's "incompetence, evasiveness, or dishonesty").

No great stretch of imagination is required to think of similar examples of how cross-examination can address an interpreter's proficiency, honesty, or methodology. One common focus of cross-examination of an interpreter or translator is to inquire into the witness's language fluency. *See, e.g., United States v. Martinez-Gaytan*, 213 F.3d 890, 892-93 (5th Cir. 2000) (vacating denial of motion to suppress defendant's confession interpreted into English by federal agent so that court could assess the agent's ability as an interpreter and give defendant opportunity to attack quality of interpretations); *United States v. Hernandez*, 995 F.2d 307, 311-12 & n.9 (1st Cir. 1993) (noting that defendants had opportunity on cross-examination to test Spanish language proficiency of DEA agent who translated incriminating statements into English); *Hernandez-Garza v. I.N.S.*, 882 F.2d 945, 947-48 (5th Cir. 1989) (holding that immigration judge denied alien fair deportation proceeding by denying cross-examination to test language fluency of officers who transcribed English translation of alien's Spanish-language statements) ("the attempt by . . . counsel to test the agents' fluency in Spanish was appropriate and reasonable, and may have been the only meaningful way to measure the testimony").

Just as the task of interpretation is not uniquely immune to human error, so too is it

not uniquely immune to human suggestion or manipulation. The Supreme Court has expressed concern that experts "responding to a request from a law enforcement officer may feel pressure – or have an incentive – to alter the evidence in a manner favorable to the prosecution." *Melendez-Diaz*, 557 U.S. at 318. Those concerns may arise in the interrogation-room context, where an interpreter is not exercising professional judgment behind a "veil of ignorance [that] makes it unlikely that [he or she] has a defendant-related motive to behave dishonestly." *Williams*, 132 S. Ct. at 2249 (Breyer, J., concurring). After spending hours within the coercive atmosphere of a police interrogation, hearing a veteran detective make targeted accusations at a suspect, an interpreter could conceivably become more error-prone or begin to shade the interpretations against the suspect.

In addition, Taylor's brief notes that fatigue resulting from the extraordinary mental demands of interpreting over prolonged periods can affect the accuracy of interpretations. *See, e.g.*, Maryland Administrative Office of the Courts, Court Interpreter Coordinator Manual, at 59 (July 2015), *available at* http://www.courts.state.md.us/ interpreter/pdfs/courtinterpretercoordinatormanual2015.pdf (last visited Dec. 23, 2015) (advising judges to provide periodic rest breaks for court interpreters because "interpreter accuracy declines significantly after 30 minutes of continuous interpretation"). Over the nearly five-hour course of Taylor's interrogation, the interpreters received only two breaks: a ten-minute break after about two and a half hours of testimony, and a two-minute break another hour later. Most of the more incriminating statements attributed to Taylor occurred during the later portions of the interrogation. Live testimony from the

interpreter might have suggested that fatigue or inattention undermined the accuracy of those interpretations.

Even in cases where an interpreter is fully capable and impartial, questioning of the interpreter might illuminate the precise meaning of a particularly important statement. For example, in *People v. Gutierrez*, 137 Cal. App. 3d 542, 544-47 (Ct. App. Cal. 1982), the court held that, in a Spanish-speaking defendant's trial for forcible rape, the trial court infringed the defendant's right to cross-examine the State's witnesses by precluding questions about the actual Spanish words that he had used in his confession. The translator had interpreted the defendant's confession to mean that he had *physically* forced himself upon the victim, but the court recognized that a "substantially different connotation could have been drawn by the jury had Gutierrez said he was only trying to force his affections upon [her]." *Id.* at 547. Similarly, in *Territory v. Kawano*, 20 Haw. 469, 472-77 (Sup. Ct. Terr. Haw. 1911), the court held that, in a Japanese-speaking defendant's trial for committing perjury in a prior proceeding, the trial court improperly denied the defendant the right to cross-examine the court interpreter about the precise Japanese words that the defendant had used. The interpreter had translated the defendant's statements to mean that the defendant had witnessed a business transaction, but the defendant claimed that he "did not testify positively" about the transaction and that he had prefaced his remarks (in Japanese) with the explanation that he believed his statements to be true based on what another person had told him. *Id.* at 474.

In the instant case, a similarly subtle dispute over meaning was crucial: the interpreter stated that Taylor admitted that he repeatedly had touched specific body parts

-37-

of specific students but that the touching was accidental; Taylor's defense sought to show that Taylor only told that interpreter that, *if* he had touched anyone, it *would have* been an accident.[12]

The State correctly concedes that Taylor had the right to "dispute the accuracy of the interpretation[s]," but argues that he was not entitled to be confronted with the person who interpreted his statements. The State first tells us that "Taylor was free to subpoena Smith and question him about his interpretations." The Supreme Court, however, has already rejected the notion that a defendant's power to subpoena the declarants whom the State chooses not to call is a permissible substitute for confrontation: "the Confrontation Clause imposes a burden on the prosecution to present its witnesses, not on the defendant to bring those adverse witnesses into court." *Melendez-Diaz*, 557 U.S. at 324.

The State next tells us that there was no Sixth Amendment violation because Taylor was free to take the stand himself or to call another language expert to dispute Smith's interpretations. The Court already disposed of that line of argument too. *See Bullcoming*, 131 S. Ct. at 2715-16 (holding that cross-examination rights are not satisfied simply because defendant has an opportunity to examine a "substitute" or "surrogate" witness because "the Clause does not tolerate dispensing with confrontation simply because the court believes that questioning one witness about another's testimonial statements provides a fair enough opportunity for cross-examination").

---

[12] In grammatical terms, the interpreter expressed Taylor's statements in the indicative mood to assert an objective fact about what Taylor had done. Taylor, by contrast, contends that he actually employed the subjunctive mood to make a statement about what hypothetically might have occurred.

In sum, the Supreme Court, in a different context, has already considered and rejected nearly all of the possible justifications for creating a confrontation exception for interpreters. Indeed, this case would fall squarely under *Melendez-Diaz* and *Bullcoming* if, instead of relying on a recording of Smith's statements, the State had submitted an affidavit from a language expert, attesting to that expert's English-language translation of the conversation. The interpretation of a suspect's statements during a custodial interrogation is no less testimonial than an expert affidavit.

D.       **Conflicting Doctrines Adopted by United States Courts of Appeals**

Our analysis of controlling precedent from the Supreme Court and from the Court of Appeals of Maryland guides us to conclude that the State introduced testimonial hearsay when it offered a recording of Smith's interpretations as evidence against Taylor. Neither of those Courts, however, has applied the *Crawford* holding to the factual circumstances that we face here.

A number of cases from United States Courts of Appeals have addressed the issue of whether a defendant has the right to confront an interpreter used during a government interrogation. As he did at his trial, Taylor now urges us to follow the post-*Crawford* reasoning of the Eleventh Circuit in *United States v. Charles*, 722 F.3d 1319 (11th Cir. 2013). For its part, the State argues that we should reject *Charles* and instead adopt the approach taken by the Ninth Circuit in the pre-*Crawford* case of *United States v. Nazemian*, 948 F.2d 522, 525-28 (9th Cir. 1991), *cert. denied*, 506 U.S. 835 (1992), which Ninth Circuit panels have deemed themselves obligated to follow pending a decision from the entire court en banc. *See United States v. Orm Hieng*, 679 F.3d 1131

-39-

(9th Cir.), *cert. denied*, 133 S. Ct. 775 (2012).

In *Charles*, the Eleventh Circuit became the first appellate court to fully analyze the admissibility of out-of-court interpretations against a defendant according to the principles established by *Crawford*, *Melendez-Diaz*, and *Bullcoming*. The defendant in that case, Manoucheka Charles, was a Haitian national who spoke Creole and did not speak or understand English. *Charles*, 722 F.3d at 1320. Customs and Border Patrol officers detained Charles for questioning upon her arrival at Miami International Airport. *Id.* at 1321. An officer who did not speak Creole interrogated Charles with the assistance of an interpreter. *Id.* At Charles's trial for knowingly using a fraudulently altered travel document, the customs officer testified about certain incriminating statements that the interpreter said that Charles had made. *Id.* Because the government did not call the interpreter, Charles had no "opportunity to cross-examine the interpreter regarding what any of Charles's purported statements meant or what specific words or phrases Charles actually used." *Id.* at 1321.

In an opinion by Judge Rosemary Barkett, the Eleventh Circuit panel held that the Confrontation Clause guaranteed Charles "the right to confront the Creole language interpreter about the statements to which the [customs] officer testified to in court." *Id.* at 1325. The Court explained that the interpreter's English language statements about what Charles said in Creole were testimonial hearsay because the interpreter made those statements in the context of an interrogation and because the government offered the interpreter's statements to prove the truth of those statements. *Id.* at 1323-24. The Court reasoned that, for Confrontation Clause purposes, there were two sets of out-of-court,

-40-

testimonial statements made by two different declarants: "Charles [was] the declarant of her out-of-court Creole language statements and the language interpreter [was] the declarant of [the interpreter's] out-of-court English language statements." *Id.* at 1324.

The government had contended that the Court should view the interpreter's English statements as Charles's statements by extending the reasoning of older cases involving the admissibility of interpreted statements over hearsay objections. *Id.* (citing *United States v. Alvarez*, 755 F.2d 830, 860 (11th Cir. 1986), and *United States v. Da Silva*, 725 F.2d 828 (2d Cir. 1983)). Those cases, which not only predate *Crawford*, but do not address the issue of confrontation, held that an officer's testimony as to an interpreter's out-of-court interpretations of what a defendant said may be admissible under federal hearsay rules. *See Alvarez*, 755 F.2d at 589-60 (citing *Da Silva*, 725 F.2d at 832). The Eleventh Circuit declined the government's invitation to ignore the interpreter and to treat the interpreter's English statements as if Charles had made them directly to the officer. *Id.* at 1325.

Under the rationale of *Da Silva* and other pre-*Crawford* cases that adopted its reasoning, a defendant may adopt an interpreter as an agent or authorize an interpreter to speak on his or her behalf. *See Da Silva*, 725 F.2d at 831-32. The Federal Rules of Evidence characterize those statements as non-hearsay when they are offered against the defendant. *See* Fed. R. Evid. 801(d)(2)(C), (d)(2)(D) ("A statement is not hearsay if . . . (2) [t]he statement is offered against a party and is . . . (C) a statement by a person authorized by him to make a statement concerning the subject, or (D) a statement by his agent or servant concerning a matter within the scope of his agency or employment, made

during the existence of the relationship").[13] Notably, in treating an interpreter as the defendant's agent or as a person authorized to speak for the defendant, cases like *Da Silva* do not characterize "the interpreter's statements as the same as the defendant's own statements." *Charles*, 722 F.3d at 1326. In other words, even where an interpreter's statements may be "attributable" to a defendant for hearsay purposes (*Da Silva*, 725 F.2d at 832), an interpreter is still the declarant of his or her own statements about what the defendant has said. *See Charles*, 722 F.3d at 1326-27. If older cases like *Da Silva* had viewed the interpreter's statements as the defendant's own statements, then they would have relied on Fed. R. Evid. 801(d)(2)(A), the separate hearsay exception for a party's own statements. *See Charles*, 722 F.3d at 1326-27.

In *Da Silva*, 725 F.2d at 831-32, the Second Circuit established a reliability-based test to evaluate the circumstances under which an interpreter may be treated as the defendant's authorized agent under federal evidentiary rules. Under this test, an interpreter is presumptively viewed as the defendant's agent when the defendant consciously relies upon the interpreter to communicate. *Id.* The defendant can negate that inference of agency by affirmatively showing some bias or incompetence on the interpreter's part. *Id.* at 832. "Where, however, there is no motive to mislead and no reason to believe the translation is inaccurate, the agency relationship may properly be found to exist," and "the translator is no more than a 'language conduit[.]'" *Id.* at 832 (quoting *United States v. Ushakow*, 474 F.2d 1244, 1245 (9th Cir. 1973) (per curiam)).

---

[13] The corresponding Maryland rule classifies those types of statements as hearsay, but admits them under an exception. Md. Rule 5-803(a)(1), (3), and (4).

In *Charles*, the Eleventh Circuit reasoned that in the post-*Crawford* era this so-called "language-conduit" doctrine is both inapplicable and inappropriate for analyzing whether the interpreter's statement is testimonial under the Confrontation Clause. The Court explained: "*Da Silva*'s view of an interpreter as a 'language conduit[]' . . . was premised on the court's assessment of the interpreter's reliability and trustworthiness, principles supporting the admissibility of the interpreter's statements under [the Federal Rules of Evidence], but having no bearing on the Confrontation Clause." *Charles*, 722 F.3d at 1327 (citations omitted).

The *Charles* court emphasized that in *Crawford* the Supreme Court rejected the reliability of a statement as the criterion for assessing confrontation violations, and in *Melendez-Diaz* the Court "emphatically reiterated its rejection of a reliability standard" when it declined to create a forensic evidence exception. *Charles*, 722 F.3d at 1327-28 (citations omitted). "If, as we know from *Melendez-Diaz*, even results of 'neutral, scientific testing[]' do not exempt the witness who performed the test from cross-examination, certainly the Confrontation Clause requires an interpreter of the concepts and nuances of language to be available for cross-examination at trial." *Id.* at 1329.

Moreover, just as the Supreme Court refused to permit a surrogate third-party expert to substitute for the certifying analyst who performed a test in *Bullcoming*, "so too," the *Charles* court reasoned, "must a language interpreter and not a substitute third party be subject to cross-examination." *Id.* at 1331. As the *Charles* court pointed out, a law enforcement officer who has no understanding of the defendant's language aside from what the officer hears from the interpreter is obviously "a much less suitable

-43-

substitute" than the surrogate expert who testified about another expert's conclusions in the case against Bullcoming. *Id.*[14]

In our view, the Eleventh Circuit's reasoning in *Charles* is fully consistent with the interpretation of the Sixth Amendment set forth by the Supreme Court in *Crawford* and in the Court's cases applying *Crawford*. Under the Supreme Court's pre-*Crawford* approach to the Confrontation Clause, it might have been reasonable to hold that a court could dispense with confrontation for an interpreter's testimonial statements because the statements fit within a recognized hearsay exception and are comparatively more reliable than statements from other witnesses. After *Crawford*, *Melendez-Diaz*, and *Bullcoming*, however, that approach is no longer viable.

In attempting to uphold Taylor's conviction, the State relies on a line of cases that derive from the now-defunct, pre-*Crawford* paradigm, under which it would not violate the Confrontation Clause to admit the hearsay statements of a declarant who failed to testify at trial, provided that the statements fell within some well-recognized exception or had other indicia of "reliability." Thirteen years before *Crawford*, in *United States v. Nazemian*, 948 F.2d 522, 525-28 (9th Cir. 1991), *cert. denied*, 506 U.S. 835 (1992), the

---

[14] Because Charles had not objected to the admission of the officer's testimony, the Eleventh Circuit reviewed her challenge for plain error. *Charles*, 722 F.3d at 1322. The Court ultimately held that the admission of the officer's testimony regarding the English interpretations ran afoul of the Sixth Amendment, but that any error was not plain because there had been no binding precedent clearly articulating that a language interpreter was the declarant of the interpreted statements. *Id.* at 1331. One member of the panel concurred on the narrow ground that there was no plain error, but opined that it was "unnecessary to decide a novel and difficult question of constitutional law in an area where the Supreme Court's jurisprudence is still evolving." *Id.* at 1332 (Marcus, J., concurring).

Ninth Circuit held that a government agent could testify regarding statements made by an interpreter of the defendant without implicating the defendant's confrontation rights. The Ninth Circuit purported to resolve the constitutional issue by considering "as a threshold matter whether the interpreter or the defendant should be viewed as the declarant" of the interpreted statements. *Id.* at 525.

According to the Ninth Circuit, if an interpreter's statements "properly are viewed as" the defendant's own statements, "then there would be no confrontation clause issue since [the defendant] cannot claim that she was denied the opportunity to confront herself." *Id.* at 525-26. Borrowing from the agency and "language-conduit" concepts used in hearsay cases such as the Second Circuit's *Da Silva* opinion, the Ninth Circuit opined that the correct approach to the confrontation issue was to "consider on a case-by-case basis whether the translated statements fairly should be considered the statements of the speaker." *Id.* at 527. The Court then identified some of the relevant factors for "determining whether the interpreter's statements should be attributed to the defendant under either the agency or conduit theory," including "which party supplied the interpreter, whether the interpreter had any motive to mislead or distort, the interpreter's qualifications and language skill, and whether actions taken subsequent to the conversation were consistent with the statements translated." *Id.*

Many years later, after the Supreme Court transformed its Confrontation Clause approach in *Crawford* and decoupled the Confrontation Clause analysis from the question of whether a hearsay statement fell within an evidentiary exception to the general rule against hearsay, the Ninth Circuit considered a challenge from a criminal defendant who

argued that *Crawford* had overruled *Nazemian*: *Orm Hieng*, 679 F.3d at 1137-41. In that case, the Ninth Circuit declined to reconsider *Nazemian* in light of *Crawford* and its progeny. The majority explained: "As a three-judge panel, we are bound by circuit precedent unless the United States Supreme Court or an en banc court of our circuit has undercut the theory or reasoning underlying the prior circuit court precedent in such a way that the cases are clearly irreconcilable." *Orm Hieng*, 679 F.3d at 1139 (citation and quotation marks omitted).

In a sentence marked by studied understatement, the *Orm Hieng* majority conceded that there was "some tension" between *Nazemian* and the Supreme Court's approach to the Confrontation Clause since *Crawford*. *Id.* at 1140. Nevertheless, the panel reasoned that *Crawford*, *Melendez-Diaz*, and *Bullcoming* were not "in direct conflict" with the circuit's use of the language conduit approach because those cases did not expressly address whether "the Sixth Amendment requires the court to attribute the statement to the interpreter." *Id.* The Court then announced that *Nazemian* would remain binding within Ninth Circuit unless the Supreme Court or an en banc panel of that circuit overrules that holding. *Id.* at 1141.[15]

---

[15] In a subsequent reported case, another three-judge panel reiterated the narrow holding that *Nazemian* survives within that circuit. *United States v. Aifang Ye*, 792 F.3d 1164, 1168-69 (9th Cir. 2015). In addition to citing that case, the State incorrectly asserts that the Ninth Circuit applied *Nazemian*'s language-conduit theory to the Confrontation Clause challenge in *United States v. Romo-Chavez*, 681 F.3d 955 (9th Cir. 2012). To the contrary, the court in that case applied the language-conduit analysis solely to a hearsay question (*see id.* at 959-61) and then found no Sixth Amendment violation because the translator appeared at trial for cross-examination. *Id.* at 961. The State seeks further support from *United States v. Shibin*, 722 F.3d 233 (4th Cir. 2013), *cert. denied*, 134 S. Ct. 1935 (2014), which invoked the "language-conduit" concept in passing, but went on

Concurring in *Orm Hieng*, Judge Marsha Berzon agreed with the majority's

narrow holding that *Nazemian* was not so "clearly irreconcilable" with *Crawford* "as to

permit a three-judge panel to overrule" it." *Orm Hieng*, 679 F.3d at 1145 (Berzon, J.,

concurring). The concurrence nevertheless recommended that Ninth Circuit, en banc,

should reconsider the vitality of its Confrontation Clause precedent. *Id.* at 1145, 1149

(Berzon, J., concurring). Judge Berzon commented that *Nazemian*'s holding "seems in

great tension with the holdings of" *Melendez-Diaz* and *Bullcoming. Id.* at 1149 (Berzon,

J., concurring); *see also United States v. Romo-Chavez*, 681 F.3d 955, 962 n.1 (9th Cir.

2012) (Berzon, J., concurring). She added: "Translation from one language to another is

much *less* of a science than conducting laboratory tests, and so much more subject to

error and dispute." *Orm Hieng*, 679 F.3d at 1149 (Berzon, J., concurring).

Although the State urges us to reach the same result as *Orm Hieng* and to treat the

interpreter Smith as a mere conduit for Taylor's statements, it would be a mistake to treat

*Orm Hieng* as an endorsement of *Nazemian*'s constitutional analysis. The *Orm Hieng*

opinion is not based upon the Supreme Court's Sixth Amendment jurisprudence but upon

an intra-circuit principle of *stare decisis*. By its own terms, the opinion says nothing

about the viability of the language-conduit approach to Confrontation Clause cases

anywhere outside the Ninth Circuit. *See id.* at 1141 ("Without a further pronouncement .

---

to reject a Confrontation Clause challenge on the ground that the statement in question had not been offered for its truth. *See id.* at 248-49. Finally, the State cites an unreported opinion from another federal circuit court. "'However, it is the policy of this Court in its opinions not to cite for persuasive value any unreported federal or state court opinion.'" *Margolis v. Sandy Spring Bank*, 221 Md. App. 703, 718 n.10 (2015) (quoting *Kendall v. Howard Cnty.*, 204 Md. App. 440, 445 n. 1, (2012), *aff'd*, 431 Md. 590 (2013)).

. . *Nazemian* remains binding *in this circuit*") (emphasis added).

Unlike a three-judge panel from the Ninth Circuit, this Court is not required to uphold prior Ninth Circuit precedent that is in significant tension with Supreme Court jurisprudence. Our task is not to determine whether *Nazemian* is "clearly irreconcilable" with *Crawford*, but to decide whether *Nazemian* is actually correct under *Crawford*. We are unconvinced that it is.

One major indication that *Nazemian* retains little if any authoritative weight is that the case was decided under the pre-*Crawford* paradigm. The Supreme Court has reiterated that *Crawford* "adopted a fundamentally new interpretation of the confrontation right" (*Williams*, 132 S. Ct. at 2232 (plurality opinion of Alito, J.)) and "announced a new rule" that was not dictated by prior precedent. *Whorton v. Bockting*, 549 U.S. 406, 416 (2007); *see Danforth v. Minnesota*, 552 U.S. 264, 270 (2008). In addressing Nazemian's confrontation challenge, the Ninth Circuit initially invoked the holding that hearsay statements from an unavailable declarant may be admitted against a defendant upon a showing that the statements are trustworthy. *Nazemian*, 948 F.2d at 525 (citing *Ohio v. Roberts*, 448 U.S. 56 (1980)). Yet, in *Crawford*, 541 U.S. at 60-68, the Court expressly rejected that holding. Even though the Ninth Circuit's reasoning avoided direct reliance upon *Ohio v. Roberts* by deeming the interpreter's statements to be those of the defendant (*see Nazemian*, 948 F.2d at 525-26 & n.5), it is apparent that *Nazemian* was founded upon "a pre-*Crawford* understanding of the unity between hearsay concepts and Confrontation Clause analysis." *Orm Hieng*, 679 F.3d at 1149 (Berzon, J., concurring). Indeed, *Nazemian*'s confrontation analysis in no way resembles the type of analysis currently

used by the Supreme Court.[16]

The *Nazemian* court's analysis rests on four pillars, none of which withstands scrutiny under the Supreme Court's current jurisprudence.

First, *Nazemian* uses rhetorical sleight of hand to distract attention from the fact that an interpreter makes assertions about the English meaning of what the defendant has said in his or her own language. By referring to an interpreter as "a mere language conduit" (*Nazemian*, 948 F.2d at 528), *Nazemian* disregards the difficult realities of real-time language interpretation, including the reality that the interpreter must understand what the defendant meant and remember what the defendant said while simultaneously exercising judgment and discretion to convert one set of symbols to another without altering what the defendant intended to convey. While it may have been rhetorically useful in the pre-*Crawford* era to proceed as though the interpreter channels the defendant's intended meaning like a medium at a séance, the language-conduit approach reveals nothing about the substantive legal questions of whether a defendant has the right to confront an interpreter about bias, proficiency, and errors or inaccuracies in the translation. *See Bullcoming*, 131 S. Ct. at 2714 (rejecting notion that lab technician was "mere scrivener").

---

[16] Even before *Crawford*, a California appellate court concluded that a trial court had violated a defendant's constitutional rights (but had committed only harmless error under the circumstances) by admitting an English-language translation of recorded Spanish-language conversations without testimony from the translator. *People v. Torres*, 164 Cal. App. 3d 266, 269-70 (1985). The court reasoned: "The failure to call the original translator to the witness stand denied the defendant a meaningful opportunity to cross-examine the individual who translated the material as to his qualifications and the accuracy of the translation." *Id.* at 269.

Second, the language-conduit approach creates a legal fiction as to the identity of the speaker. *Nazemian* shifts the inquiry from the person who actually made the relevant out-of-court statement (the interpreter) to questions of whether the interpreter's statements "properly are viewed as" the defendant's own (*Nazemian*, 948 F.2d at 526), whether the interpreter's statements "fairly should be considered the statements of the speaker" (*id.* at 527), or whether the interpretation is "properly attributable to the defendant." *Id.* The word choice is revealing: even the courts adopting this approach do not actually say that the defendant "made" the interpreter's statements. Rather, by judicial fiat, the language-conduit approach collapses the defendant and the interpreter into a single witness for constitutional purposes. This technique is certainly at odds with *Bullcoming*, 131 S. Ct. at 2713-16, which insisted upon live testimony from the person who actually made the testimonial assertions about forensic test results, and not from a surrogate. In any event, even if it were "proper" or "fair" to attribute interpreted statements to the defendant, "'it does not follow that the rights [set forth in the Sixth Amendment] can be disregarded so long as the trial is, on the whole, fair.'" *Id.* at 2716 (quoting *United States v. Gonzalez-Lopez*, 548 U.S. 140, 145 (2006)); *accord Giles*, 554 U.S. at 375 ("the guarantee of confrontation is no guarantee at all if it is subject to whatever exceptions courts from time to time consider 'fair'") (plurality opinion by Scalia, J.). [17]

_____

[17] Comparing an interrogation-room interpreter to a courtroom interpreter confirms that an interpreter is a separate witness, distinguished from the person whose testimony he interprets. The interpreter must be independently competent to testify, takes a special oath to interpret testimony accurately (*e.g.,* Fed. R. Evid. 604; Md. Rule 1-333(c)(3)), and

-50-

Third, *Nazemian*'s constitutional analysis depends upon an analogy to evidentiary rules regarding hearsay. In accordance with the principles of *Ohio v. Roberts*, which dictated the relevant analysis at the time when *Nazemian* was decided, the opinion relied almost exclusively upon cases analyzing hearsay questions under the Federal Rules of Evidence, not upon cases construing the Confrontation Clause. *See Nazemian*, 948 F.2d at 526-27 & n.5 (citing cases including *Da Silva*, 725 F.2d at 831). As previously stated, however, the Supreme Court has since renounced the view of *Ohio v. Roberts*, that the admission of hearsay does not violate the Confrontation Clause, as long as the hearsay is admissible under a well-recognized exception or is otherwise "reliable." *See Crawford*, 541 U.S. at 51 ("Leaving the regulation of out-of-court statements to the law of evidence would render the Confrontation Clause powerless to prevent even the most flagrant inquisitorial practices"); *see also Williams*, 132 S. Ct. at 2256 ("concepts central to the application of the Confrontation Clause are ultimately matters of federal constitutional law that are not dictated by state or federal evidentiary rules") (Thomas, J., concurring); *id.* at 2272 ("we do not typically allow state law to define federal constitutional requirements") (four-member dissenting opinion by Kagan, J.). A possible "language-conduit" exception to twentieth-century federal hearsay rules is by no means a constitutional confrontation exception that was "established at the time of the founding."

---

is subject to cross-examination and impeachment regarding the interpretations. *See, e.g.*, *United States v. Rayas*, 20 C.M.R. 195, 198 (Ct. Military App. 1955); *People v. Lem Do*, 132 Cal. 199, 201 (Sup. Ct. Cal. 1901); 81 Am. Jur. 2d Witnesses § 738 (Aug. 2015); *see also* 6 Lynn McLain, *Maryland Evidence: State and Federal* § 604:1 (2d ed. 2001).

*Crawford*, 541 U.S. at 54. "The text of the Sixth Amendment," after all, "does not suggest any open-ended exceptions to the confrontation requirement to be developed by the courts." *Id.*

Fourth, *Nazemian* premises the admissibility of the absent interpreter's statements upon the apparent reliability of the interpretations. This fourth pillar is the weakest of all. As Taylor correctly points out, each one of the *Nazemian* factors (who supplied the interpreter; the interpreter's possible motives to mislead or distort; the qualifications of interpreter; and consistency of the interpreted conversation and parties' subsequent actions) "is simply a different way of inquiring into the interpreter's reliability." Courts that have adopted the *Nazemian* factors openly treat the reliability of the interpretations as the ultimate standard for assessing whether an interpreter should be viewed as a conduit. *E.g. Martinez-Gaytan*, 213 F.3d at 892 (distinguishing *Nazemian* because accuracy of interpreted statements appeared "less reliable" than statements in other cases); *United States v. Garcia*, 16 F.3d 341, 344 (9th Cir. 1994) (reasoning that facts confirming "reliability" of officer's translations demonstrated that officer was acting as conduit); *People v. Gutierrez*, 916 P.2d 598, 601 (Col. Ct. App. 1995) (analyzing "reliability of the interpretation" to determine whether interpreter served as conduit).

Indeed, *Nazemian*'s four-factor reliability test is akin to the unpredictable and subjective multi-factor "indicia of reliability" tests that the Washington courts had used to assess Sylvia Crawford's testimonial statements. *See Crawford*, 541 U.S. at 41, 63-64. "By replacing categorical constitutional guarantees with open-ended balancing tests, [courts] do violence to their design." *Id.* at 67-68.

-52-

In sum, the Ninth Circuit's language-conduit doctrine does exactly what *Crawford* forbids: it leaves "the Sixth Amendment's protection to the vagaries of the rules of evidence" and to "amorphous notions of 'reliability.'" *Crawford*, 541 U.S. at 61. *Nazemian* guides judges to make a threshold determination of the interpreter's honesty, proficiency, and methodology without testimony from the one witness whose testimony could best prove the accuracy of the interpretations – the interpreter himself or herself. Like the repudiated rule of *Ohio v. Roberts*, the *Nazemian* doctrine "allows a jury to hear evidence, untested by the adversary process, based on a mere judicial determination of reliability." *Crawford*, 541 U.S. at 62. The Supreme Court in *Melendez-Diaz* found it necessary to sweep away a body of late twentieth-century case law regarding forensic analysts, including cases that did not rely directly on *Ohio v. Roberts*, because those cases relied on the "erroneous" and "since-rejected theory that unconfronted testimony was admissible as long as it bore indicia of reliability." *See Melendez-Diaz*, 557 U.S. at 312. For similar reasons, we conclude that *Nazemian*'s confrontation holding should not be followed in Maryland.[18]

_____

[18] Both before and after *Crawford*, courts have consulted the *Nazemian* balancing test more often in the context of hearsay issues than for constitutional issues. Still, the State notes that even after *Crawford* a few courts have continued to apply the language-conduit theory in Confrontation Clause cases. In *People v. Morel*, 8 Misc. 3d 67, 71-72 (N.Y. App. Term 2005), the court held that a defendant had not preserved a claim of error based on *Crawford*, but went on to opine that a translator's accuracy was "a purely state law 'reliability' issue" that need not be tested through cross-examination of the interpreter in addition to other participants in the conversation. In *Hernandez v. State*, 291 Ga. App. 562, 568 & n.16 (2008), the court followed *Morel* in reasoning that a defendant's right to inquire into an interpreter's honesty and competency did not include a right of cross-examination. Even if the scant reasoning of these opinions were convincing, they have little value because they were decided before *Melendez-Diaz* and

Although we cannot predict with certainty how the Supreme Court might rule on the question presented here, we can safely conclude that no court could adopt *Nazemian*'s constitutional test without abandoning or substantially undercutting *Crawford*, *Melendez-Diaz*, and *Bullcoming*. In our view, the Eleventh Circuit's analysis from 2013, and not the Ninth Circuit's reasoning from the pre-*Crawford* era, illustrates the correct application of current law. [19]

We understand that a confrontation requirement for interpreters will impose greater burdens than a procedure that requires the trial judge only to make a threshold determination of the interpreter's probable reliability. In *Melendez-Diaz*, the Supreme

---

*Bullcoming* brought further clarity to these issues. The State also cites *People v. Jackson*, 292 Mich. App. 583, 595-97 (2011), which adopted the language-conduit theory for a confrontation issue after *Melendez-Diaz*. In that case, a nurse reported whether a patient squeezed the nurse's hand in response to an officer's questions – a squeeze meant "yes," and no squeeze meant "no." The court held that the defendant's confrontation rights were satisfied because the nurse served as a conduit, and the defendant "had a full opportunity to cross-examine" the officer who asked questions to the patient. *Id.* at 597. Even if the Michigan court's reasoning could survive the Supreme Court's subsequent decision in *Bullcoming*, the case is factually distinguishable from this one: interpreting a deaf suspect's sign-language responses in a five-hour custodial interrogation is a bit different from reporting whether a person has or has not squeezed your hand.

[19] Furthermore, even if we adopted the Ninth Circuit's four-factor test for assessing the admissibility of interpreted statements, the trial court made no findings as to any of the factors. Instead, the judge apparently found it dispositive that the interpreter Smith was not an accusatory witness. In addition, the judge sustained an objection to a question calculated to establish that the interpreters might be biased because the police had paid them. It would be inappropriate for this Court to make its own post hoc findings as to Smith's reliability as an interpreter. Assuming that *Nazemian*'s reliability-based analysis were a correct interpretation of the Sixth Amendment in the post-*Crawford* era, which it is not, the judgments would still need to be reversed so that a trial court could determine whether the interpreted statements are reliable enough to be admissible under *Nazemian*.

Court addressed similar concerns regarding the cross-examination requirement for forensic analysts. As a legal matter, the Court reasoned that courts have no authority to forgo specific procedural rights guaranteed by the Constitution simply to relieve the government and the trial courts of a possible inconvenience. *Melendez-Diaz*, 557 U.S. at 325. As a factual matter, the Court also expressed doubt that the "the criminal justice system" would "gr[i]nd to a halt" by insisting that certain analysts appear at trial. *Id.* at 326.[20] Even *Nazemian* recognized that the prosecution can ensure the availability of a live witness to interpret statements from a police interview: "Where translation is needed in the course of an open investigation or interrogation following arrest, there is no reason why the interview cannot be recorded and/or the translation cannot be conducted by a certified translator who can be available to testify at trial." *Nazemian*, 942 F.2d at 527 n.7.

In fact, in this particular case, the State issued subpoenas to require that the two sign-language interpreters, Charm and Joe Smith, would be available to testify both at a suppression hearing and at trial. In addition, because the police had recorded the interrogation, another interpreter might have provided his or her own translation if Joe Smith were unavailable. The record does not disclose why the State introduced the interpreter's statements through the detective instead of calling the interpreter himself and subjecting him to cross-examination during the State's case.

---

[20] The Court also noted that states were free to adopt procedural rules requiring defendants to assert some Confrontation Clause objections in advance of trial. *See Melendez-Diaz*, 557 U.S. at 326-27.

In summary, even the "'obviou[s] reliab[ility]' of a testimonial statement does not dispense with the Confrontation Clause." *Bullcoming*, 131 S. Ct. at 2715 (quoting *Crawford*, 541 U.S. at 62). The constitutional right to confrontation "is a procedural rather than a substantive guarantee," commanding "not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Crawford*, 541 U.S. at 62. Because the court's rulings deprived Taylor of the opportunity to challenge the reliability of the State's evidence in the manner in which the Constitution prescribes, the judgments shall be reversed. On remand, the State may not introduce Smith's statements against Taylor (whether through audio or through the memory of the detectives who heard Smith's statements) unless Taylor has an opportunity to cross-examine Smith in the State's case against him.[21]

## II.

Because this case must be remanded, we address the remaining issues to the extent necessary to provide guidance at a second trial. *See, e.g.*, *Perez v. State*, 168 Md. App. 248, 286 (2006); *Odum v. State*, 156 Md. App. 184, 210 (2004).

### A.     <u>Denial of Requests to Reschedule Pre-Trial Motions Hearing</u>

We are unpersuaded by Taylor's contention that the trial court abused its discretion when it denied a defense request to postpone a pre-trial motions hearing (after which it proceeded to deny his motions).

---

[21] Taylor has not argued that he has the right to cross-examine Charm Smith, the Certified Deaf Interpreter who aided Joe Smith in his interpretations. From the video, it appears that Mr. Smith was watching Taylor directly and that Charm Smith aided him in forming his final opinion.

At the scheduled motions hearing on August 22, 2013, a new attorney entered an appearance for Taylor. She represented that Taylor's attorney of record could not attend the hearing because he was selecting a jury in another trial that he had expected to end the previous day. She informed the court that she had no knowledge of Taylor's case, and she was unprepared to argue the substance of any motion.

The State opposed the postponement, emphasizing that a new hearing date would entail considerable expense and inconvenience to the prosecutors, witnesses, and five court interpreters who had appeared for the full-day motions hearing. The court declined to postpone the hearing, commenting that Taylor's counsel of record had selected the hearing date when he had asked for the earlier postponement, that he should have anticipated the scheduling conflict earlier, and that rescheduling the hearing would be unfair to other parties. At that point, Taylor's new attorney responded that she had "no choice, but to withdraw" Taylor's pre-trial motions.

In our view, the circuit court acted well within the bounds its discretion when it refused this postponement request. *See Abeokuto v. State*, 391 Md. 289, 328-30 (2006); *Grandison v. State*, 341 Md. 175, 234 (1995). Contrary to Taylor's contentions, it is not unreasonable for a court to factor in the "expense and inconvenience that would be involved" when considering whether to require all parties to return for another hearing. *See Lett v. State*, 51 Md. App. 668, 671-72 (1982). Although trial judges have discretion to treat an attorney's unanticipated unavailability as cause for a postponement, the court was not required to grant a postponement under the circumstances presented here. *See Touzeau v. Deffinbaugh*, 394 Md. 654, 672 (2006) (explaining that appellate court will

not "overrule the trial judge's denial of a motion for continuance where the moving party has failed to demonstrate due diligence to mitigate the effects of what was alleged to be a surprise") (citing *Hughes v. Averza*, 223 Md. 12 (1960)).

Taylor protests that the trial court "never appeared to factor in the prejudicial impact" of denying the continuance. According to Taylor, the court should have foreseen that its ruling would foreclose his ability to challenge the admissibility of statements made to the police. At the time of the ruling, however, the court had no reason to assess the importance of the suppression issue because Taylor's counsel had not informed the court that he intended to argue that issue. Before the hearing, Taylor's counsel had filed only a generic omnibus motion, in which he requested "a panoply of relief based on bald, conclusory allegations devoid of any articulated factual or legal underpinning[.]" *Denicolis v. State*, 378 Md. 646, 660 (2003). Counsel had failed to make a written motion specifying the relief sought and stating with particularity the factual and legal grounds for that relief. *See* Md. Rule 4-252(e); *Sinclair v. State*, 444 Md. 16, 31 (2015). The court had already generously exercised its discretion to permit the defense to cure its deficient filing by supplementing its submissions at the hearing. *See Denicolis*, 378 Md. at 660-61. The court was not required to grant an even further extension to mitigate the consequences of trial counsel's having inconvenienced several witnesses and no fewer than five interpreters, as well as opposing counsel and the court itself, by failing to manage foreseeable scheduling conflicts

Taylor also asserts that the court was required to grant a "Motion to Re-Set Motions Hearing" filed three weeks after the pre-trial motions hearing. We see no abuse

-58-

of discretion. *See Jones v. State*, 175 Md. App. 58, 84 (2007), *aff'd*, 403 Md. 267 (2008).

The range of discretion on a request to reconsider the denial of a postponement request is, if anything, even more expansive than the court's (already considerable) discretion in weighing the underlying postponement request.[22]

### B. Propriety of Scheduling and Holding a Joint Trial of Offenses

Taylor contends that "the trial court erred in joining the [] charges against [him] into one trial." Taylor has not demonstrated that the court erred or abused its discretion by conducting a joint trial.

The State charged Taylor in seven separate indictments, each of which corresponded to one of the seven complaining witnesses. Taylor asserts that, to pursue a joint trial on those offenses, the State was required to file a written motion, within 30 days after the earlier of the appearance of defense counsel or Taylor's first appearance in court (*see* Md. Rule 4-252), but that the State never filed such a motion. Taylor also asserts that under Rule 4-253(b) the parties alone may move for joinder of offenses and that the court may not order joinder on its own motion unless both parties consent.

Assuming (without deciding) that Taylor's legal argument is correct, the record refutes Taylor's factual assertions. In fact, the court did not join the cases on its own motion, and it issued no order of joinder. Rather, in responding to a series of scheduling

---

[22] Nonetheless, in response to a proper motion from Taylor on remand, the court, in its discretion, may allow him another opportunity to raise his pre-trial motions. *See* Md. Rule 4-252(h)(2)(C) ("[i]f the court denies a motion to suppress evidence, the ruling is binding at the trial unless the court, on the motion of a defendant and in the exercise of its discretion, grants a supplemental hearing or a hearing de novo and rules otherwise").

requests, the court scheduled and then rescheduled a consolidated trial on all charges with the consent of both parties. The defense raised no objection to the court's actions either at the time of the initial decision or over the five months that followed.

On February 28, 2013, a few weeks after Taylor's attorney entered his initial appearance, he and Taylor appeared for a scheduling conference. After calling the case numbers for all seven charging documents, the Assistant State's Attorney said, "with respect to the trial date . . . [w]e anticipate trying all seven together for judicial economy purposes. We are hoping to get a date after all of the victims . . . are out of school." The judge instructed the clerk to reserve one day for motions and five days for the trial. After some brief logistical discussions, the court informed defense counsel: "So we'll motions set [sic] for June 14 and the trial will be set for July 15th." Taylor's attorney agreed that the trial date was acceptable and thanked the court.

In these circumstances, we see no error or abuse of discretion in the court's scheduling decision. *See Sears v. State*, 9 Md. App. 375, 380 (1970) (rejecting contention that offenses from separate indictments were improperly consolidated for trial where "the record disclose[d] that both the appellant and the State were satisfied to have the three indictments tried at the same time"). "While the court passed no formal order that the three indictments be tried together, it is apparent from the record that the joinder was with the consent of the appellant and the State." *Id.*[23]

---

[23] *Sears* was decided under former Rule 734, a precursor to current Maryland Rule 4-235. The Court of Appeals has held that opinions citing to former Rule 734 are appropriate sources for construing Rule 4-235, because the current language is "virtually

To preserve the right to appellate review of the trial court's decision to schedule a consolidated trial (on the basis that the State failed to make its request in a timely written motion), Taylor needed to object at the time the court made its scheduling decision. *See* Md. Rule 4-323(c). Taylor's attorney, however, affirmatively agreed to the scheduling of the consolidated trial. Later, Taylor's attorney failed to raise the scheduling issue at a hearing on June 14, 2013, at which the court granted a defense request to postpone the trial date. After that hearing, Taylor and his attorney both signed a document that indicated their agreement to appear for a jury trial in all seven cases on October 28, 2013. As the cases advanced to trial, Taylor's attorney failed to raise objections or even to seek any clarification regarding the trial schedule. *See Tracy v. State*, 319 Md. 452, 457 (1990) ("'[a] defendant can lose his rights under joinder and severance law by failing to assert them in a timely fashion'") (citation omitted).

At last, only four weeks before the scheduled trial date for all seven cases, the defense filed a "motion for severance" pursuant to Md. Rule 4-253(c). The supporting memorandum argued that joinder of the offenses was impermissible because the evidence related to each of the victims would not be mutually admissible at separate trials.

During a hearing on that motion, Taylor's attorney argued, for the first time, that the State had waived any request to try the cases jointly because the State had not filed a timely motion for joinder. He represented to the court that it was "[a]bsolutely" true that he was preparing for only a single case on the initial October trial date. He did not,

---

identical, in pertinent part, to [that of] its precursors." *Frazier v. State*, 318 Md. 597, 607 n.7 (1990).

however, explain which of the seven cases he expected to try first, nor offer any explanation of how he expected to select seven juries and try all seven cases in the span of just a few days. The circuit court found that defense counsel's representations were not credible.

After reviewing the transcript from the scheduling hearing on February 28, 2013, the circuit court went on to find that the parties had mutually agreed that the cases would be tried together. We see no clear error in that factual finding. *See, e.g.*, *Sifrit v. State*, 383 Md. 77, 92-93 (2004).

The court proceeded to deny Taylor's severance motion, finding that the request for a severance was untimely. The court nevertheless reached the merits and determined that severance was not required in any event. The court reasoned that evidence relating to each victim would be admissible at separate trials to show the absence of mistake. *See, e.g., McKinney v. State*, 82 Md. App. 111, 125-26 (1990). The court then concluded that the interests of judicial economy outweighed the potential prejudice to Taylor.

Taylor does not challenge the court's legal conclusion that the evidence of the separate offenses would have been mutually admissible at separate trials, nor does he dispute that the interests of judicial economy weighed heavily in favor of joinder. Taylor argues only that the potential prejudice from joinder was substantial. In essence, he asserts that the trial judge should have struck a different balance when it weighed these competing considerations.

It is, however, not our practice to second-guess this type of informed exercise of a trial court's discretion. *See Garcia-Perlera v. State*, 197 Md. App. 534, 548-50 (2011)

("if the evidence is deemed mutually admissible, then 'any judicial economy that may be had will usually suffice to permit joinder unless other non-evidentiary factors weigh against joinder'") (quoting *Conyers v. State*, 345 Md. 525, 556 (1997)); *Solomon v. State*, 101 Md. App. 331, 348 (1994) ("we have found no Maryland decision where, once the initial hurdle of mutual admissibility has been cleared, a decision by a trial judge to order a trial joinder has ever been held to be an abuse of discretion"). The court did not err or abuse its discretion by denying the motion for severance.

### C. Limits on Cross-Examination of State's Witnesses

During its case-in-chief, the State called one parent of each of the minor complainants. The parent-witnesses testified almost entirely on the subjects of when their daughters had been enrolled at the Maryland School for the Deaf and whether their daughters had permission to reside overnight at the dormitory. The general purpose of this testimony was to establish that Taylor had "permanent or temporary care or custody or responsibility for the supervision of a minor," an element of the crime of sexual abuse of a minor. Md. Code (2001, 2012 Repl. Vol.), Criminal Law Art., § 3-602(b)(1); *see Ellis v. State*, 185 Md. App. 522, 541-50 (2009).

Beginning with the defense's cross-examination of the first parent-witness, the court consistently sustained the State's objections to questions that did not concern the narrow topics that the witnesses had mentioned during direct examination. For example, during the cross-examination of De.'s mother, the defense asked: "Have you ever talked to any attorney about a civil suit regarding this incident?," and "Do you know an attorney by the name of Christopher Brown?" The court sustained the State's objections to both

questions, without comment. At a bench conference shortly thereafter, defense counsel asked for permission to recall De.'s mother as a defense witness, and the court suggested that the defense would need to serve her with a subpoena. The prosecutor then argued that facts related to a civil lawsuit would be irrelevant and beyond the scope of direct examination. Defense counsel proffered that a civil suit was "relevant to bias."[24]

Taylor argues that his proposed cross-examination was proper because it concerned a matter affecting the credibility of the State's witness (*see* Md. Rule 5-611(b)(1)), and because a party has the right to ask questions directed at proving that a witness may be "biased, prejudiced, interested in the outcome of the proceeding, or [may have] a motive to testify falsely[.]" Md. Rule 5-616(a)(4). Evidence of an actual or contemplated civil lawsuit by a witness against a criminal defendant, arising from the same set of circumstances as the criminal prosecution, may reveal a potential source of bias, interest in the outcome of the proceedings, or motive to testify falsely. *See Martin v. State*, 364 Md. 692, 699-700 (2001). From the mere pursuit of a lawsuit, jurors may infer that the witness has "feelings of animosity" towards the accused or that the witness has "a significant financial stake in the outcome of the criminal proceedings." *Maslin v. State*, 124 Md. App. 535, 541 (1999).

The State contends that Taylor did not preserve this issue because he did not

---

[24] The next day, the court also sustained, without discussion, objections to questions during cross-examination of K.'s mother about whether she had consulted with any civil attorneys regarding the case. Because Taylor was acquitted of the abuse charge related to K., the testimony of K.'s mother in all likelihood will not be introduced at a second trial.

proffer the expected answers to his questions. We disagree: the substance of the proposed examination of De.'s mother "was apparent from the context" (Md. Rule 5-103(a)(2)) of counsel's leading questions, which implied that De.'s mother had consulted a specific attorney named about a civil lawsuit regarding the alleged abuse. The trial court committed reversible error by refusing to permit Taylor to attempt to inform the jury of a possible source of the witness's bias or motive to testify falsely. *See Martin*, 364 Md. at 702; *Maslin*, 124 Md. App. at 541.

The State nevertheless argues that Taylor's proposed cross-examination was improper, on the theory that the defense's eventual aim was to use the parent's testimony as a foundation to explore the credibility of the minor child. The State assumes that, after eliciting testimony about the parent's pursuit of a civil action, defense counsel would have asked whether the parent told the child about the lawsuit or whether the parent pressured the child to testify in the State's favor. In general, a party may offer "[e]xtrinsic evidence" of a witness's "bias, prejudice, interest, or other motive to testify falsely . . . whether or not the witness has been examined about the impeaching fact and has failed to admit it." Md. Rule 5-616(b)(3). Arguably, however, matters related to the credibility of a witness other than the witness being cross-examined need not necessarily be addressed during cross-examination if those matters exceed the scope of the direct examination of that witness. *See* Md. Rule 5-611(b)(1).

Contrary to the State's assertions, the court never ruled that a lawsuit arising from the alleged abuse was irrelevant. The apparent basis for the court's rulings was, as the court repeatedly and consistently ruled throughout the trial, that the questions exceeded

-65-

the permissible scope of cross-examination.  The court made comments suggesting that the defense could in fact bring out the parents' interest in pursuing a civil suit, but only during a direct examination after the defense had subpoenaed them and called them as defense witnesses.  In this case, however, the trial court appears to have applied a blanket prohibition on cross-examination of the State's witnesses on any matters that arguably fell outside the scope of the State's direct examination.  The trial court failed to exercise the discretion vested in it by Md. Rule 5-611(b)(1) to decide on an individualized basis whether to "permit inquiry" during cross-examination "into additional matters as if on direct examination."

In deciding whether to permit a party to examine adverse witnesses on matters that exceed the scope of direct examination, the court should assess whether the line of questioning will disrupt the orderly presentation of evidence in a way that could cause undue delay or confuse the jury.  The court should also consider whether allowing the testimony during cross-examination will save time and obviate the need to inconvenience the witness and the parties by requiring the witness to be recalled.

In the instant case, the relevant interests weighed heavily in favor of permitting the defense to complete its brief and simple inquiry during the witness's initial appearance. Instead of subjecting the witnesses to a few additional questions that would consume at most a few minutes, an even greater period of trial time was spent on discussions about whether and how the defense might be able to recall those witnesses.  Furthermore, some witnesses were left in doubt as to whether they would be required to appear.  The court abused its discretion by adopting an inflexible rule about the scope of cross-examination

-66-

rather than weighing the circumstances related to each individual witness.[25]

On remand, the court must permit the defense to cross-examine each State witness about matters affecting the witness's credibility, including whether the witness has pursued a civil lawsuit in connection with the alleged crimes. Only after the court permits the defendant to pursue a basic threshold inquiry, which will give the jury sufficient information to evaluate the particular witness's potential biases and motives to testify falsely, may the court impose reasonable limits on the cross-examination to address countervailing concerns. *See Merzbacher v. State*, 346 Md. 391, 413-14 (1997). In addition, even for other matters not directly connected to the witness's credibility, the court in controlling the scope of cross-examination must exercise sound discretion to determine whether to allow the defense to introduce "additional matters as if on direct examination." Md. Rule 5-611(b)(1). The court may not, however, refuse to exercise discretion by adopting a "hard and fast rule" (*e.g.*, *Colter v. State*, 297 Md. 423, 427-28 (1983)) without making an individualized determination with reference to guiding principles.

---

[25] The State contends that any error from limiting the cross-examination of De.'s mother could not have affected the jury's verdict on the charges related to Da. The State cites no authority for this proposed application of the harmless error doctrine. As noted in the State's brief, the State sought joint trial of offenses because it believed that evidence relating to the abuse of each victim was mutually admissible. There is a reasonable possibility that a conviction of Taylor for the sexual abuse of De. could have influenced the jury's verdict as to the sexual abuse of Da. *See Hurst v. State*, 400 Md. 397, 418-19 (2007). Moreover, under the circumstances here, the court's broad restrictions on the cross-examination of the State's witnesses had a cumulative effect on the entire trial, including rulings as to which witnesses the defense could call.

**D.** **Requests to Issue Subpoenas for State Witnesses**

Finally, Taylor argues that the circuit court did not properly exercise its discretion under Rule 4-265(e) to decide whether to waive the time requirements for the issuance of subpoenas, so that Taylor could recall some of the State's witnesses after the court restricted his cross-examination of those witnesses. "Because the case will be remanded for a new trial, we need not consider whether the court erred in denying appellant's [subpoena requests made during the trial], as he will be given another chance to request the issuance of subpoenas without needing to ask the court to waive the rule's time requirements." *McCracken v. State*, 150 Md. App. 330, 364 (2003).

## CONCLUSION

We reverse the judgments of conviction because Taylor was denied his constitutional right to confront and cross-examine the interpreter during the State's case. At the new trial, the court may, but need not, allow Taylor to re-assert his pre-trial motions and need not sever the remaining charges against him. The court, however, must permit Taylor to make a basic, threshold inquiry into whether the complainants' parents have asserted or considered asserting civil claims relating to the alleged abuse of their children.

**JUDGMENTS OF THE CIRCUIT COURT FOR HOWARD COUNTY REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY HOWARD COUNTY.**